UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| MOLDEX METRIC, INC., | CASE NO. 2014-CV-_____ (_____) |
|---|---|
| Plaintiff, | **COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION (SHERMAN ACT SECTION 2), UNFAIR COMPETITION (CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200), AND MALICIOUS PROSECUTION** |
| vs. | |
| 3M COMPANY and 3M INNOVATIVE PROPERTIES COMPANY, | |
| Defendants. | **JURY TRIAL DEMANDED** |

**NATURE OF THE ACTION**

3M, one of the largest corporations in the world, has a history of using patent litigation to drive its smaller competitors from the markets in which 3M participates. In 2012, 3M filed a baseless patent lawsuit in United States District Court for the District of Minnesota against its much-smaller rival, Culver City-based Moldex Metric, Inc., in order to drive Moldex from the market for non-linear, or selective attenuation, earplugs approved for use by the U.S. Military—earplugs specifically designed to significantly attenuate the loud impulse sounds of battlefield explosions, while still allowing the wearer to hear commands spoken by fellow soldiers in the field. 3M's patent claims were baseless and were brought only to try to directly drive Moldex from the market controlled by 3M due to the cost and burden of baseless patent litigation. To bolster the threat it was making, 3M also accused Moldex of infringing a different 3M patent, based on separate earmuff products that Moldex was selling, even though Moldex had been selling these

earmuffs for almost a decade prior to the suit, and even though Moldex had invented its accused earmuff products before the priority date of the asserted 3M patent.

Contrary to 3M's expectations, Moldex did not relent in the face of this sham patent lawsuit. Instead, Moldex stood and fought against 3M's abusive conduct, incurring significant legal fees and costs, and suffering considerable disruptions to Moldex's business in the process. Realizing that 3M faced certain loss on these baseless claims, 3M then unilaterally dropped its infringement claims, dismissing them all with prejudice. Indeed, 3M dismissed the first of its claims immediately before a hearing on Moldex's motion for summary judgment of non-infringement regarding that claim. And 3M dropped the second of its infringement claims as Moldex was preparing to file a motion for summary judgment as to the invalidity of that latter patent claim. But the damage had already been done—Moldex had been forced to incur immense legal costs and suffer significant business disruptions. And even since dismissing its sham patent infringement claims, 3M has continued to use other predatory means to monopolize the market, including misusing the Javits-Wagner-O'Day ("JWOD") government contracting process, and otherwise competing unfairly. For example, 3M continues to market its dual-ended Combat Arms earplug with a "0" NRR rating based on ratings by its own in-house personnel. This "0" rating is highly misleading and anticompetitive, and it creates a false expectation in wearers that, in open position, they can hear critical sounds such as commands, approaching vehicles or combatants without any impairment. Moldex brings this lawsuit, therefore, in order to seek recompense for the harm it has suffered as a result

2

of 3M's anticompetitive and monopolistic practices, and for injunctive relief to protect it against 3M's on-going predatory conduct.

In addition, by pursuing 3M's patent infringement claims, despite knowing that they were both objectively and subjectively baseless, 3M committed malicious prosecution. Moldex therefore seeks compensatory and punitive damages to compensate it for the harm it suffered as a result and to punish 3M for its wrongful conduct and thereby deter a recurrence of such malicious and wanton conduct.

## THE PARTIES

1. Plaintiff Moldex Metric, Inc. ("Moldex") is a California corporation with its principal place of business in Culver City, California. It is in the business of designing, manufacturing and selling worker safety products, including hearing protection products and respirators.

2. Defendant 3M Company ("3M Company") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in St. Paul, Minnesota. It is in the business, among others, of designing, making and selling worker safety products, including hearing protectors and respirators. 3M has a dominant market share in virtually every safety product market relevant to this litigation.

3. Defendant 3M Innovative Properties Company ("3M Innovative") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in St. Paul, Minnesota. It is an affiliate of 3M Company, and it is the entity that 3M uses to hold and assert its intellectual property assets. 3M Company

and 3M Innovative are sometimes referred to collectively herein as "3M" or as "the 3M Defendants."

## JURISDICTION AND VENUE

4. This action arises under the antitrust laws of the United States, 15 U.S.C. §1 et seq., and under state law.

5. This Court has subject matter jurisdiction over Moldex's federal antitrust claims pursuant to 15 U.S.C. §§ 4, 15, 16, and 26, and under 28 U.S.C. § 1337. In addition, this Court has subject matter over this action, including the state law claims, by virtue of 28 U.S.C. §1332, in that this is an action between citizens of different States. This Court also has supplemental jurisdiction over Moldex's state law claims pursuant to 28 U.S.C. § 1367.

6. This Court has personal jurisdiction over the 3M Defendants because they are citizens of the State of Minnesota and because at least part of the conduct complained of by Moldex took place in the State of Minnesota.

7. Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391.

## NATURE OF TRADE AND COMMERCE

8. This action involves, among other things, "non-linear," or "selective attenuation" earplugs purchased and used by the U.S. Military to protect soldiers' hearing from the harmful effects of battlefield explosions. Non-linear earplugs block or attenuate sounds of different amplitude and frequency to differing degrees, by using a sound channel that has various constrictions and openings for the passage of sound from the

exterior to the wearer's ear canal. As a result, they can be worn by soldiers in the field so that the soldiers are protected from the intense impulse sounds of battlefield explosions, while still being able to communicate by speech with their colleagues. These earplugs can have an additional plug or other mechanism that can be used to block this selective-attenuation sound channel, so as to provide a more fulsome hearing protection effect with a completely closed earplug, just like a traditional earplug.

9. The United States military is the largest purchaser of these earplug products in the United States. The military purchases the vast majority of such products sold every year in this country. The military can only purchase these products if they meet the testing standards required by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be promulgated by other military services.

10. This action also involves a type of hearing protector called an earmuff. An earmuff is a product that protects the wearer from the harmful effects of excessive sound energy by covering the wearer's ear with a muff-like object that covers the entire exterior of the wearer's ear. These products often have layers of material on the inside, to mute even further the sound energy that is transmitted into the wearer's ear canal.

11. Hearing protectors, including earplugs and earmuffs, are sold with a listed Noise Reduction Rating. A Noise Reduction Rating ("NRR") is a measurement called for by certain measurement standards, and by certain federal regulations that have adopted those measurement standards. This rating represents the amount of sound attenuation perceived by a test group, when tested under certain required conditions, and adjusted pursuant to the test methodology. These tests can be unfairly biased either willfully or

unwittingly, by tester error, subject anomaly, and/or tester bias. As a result, many companies have an independent outside lab conduct their NRR testing. Moldex does this. 3M does not. Instead, 3M has its own personnel conduct these tests, in a lab approved for such testing, but run entirely by 3M personnel.

## RELEVANT MARKET(S)

12. 3M's activities in this case relate to one or more relevant markets. These markets include the following product markets, in the conjunctive or in the alternative: (a) a product market for non-linear earplugs that are approved for purchase by the United States military; (b) the product market for non-linear earplugs; (c) the product market for non-linear earplugs that have dual modes of setting, with one mode including a non-linear sound channel and one mode including a fully blocked earplug; and/or (d) the product market for passive (non-electronic) industrial earmuffs (the "Relevant Product Market(s)").

13. The relevant geographic market for each of the product markets described above is the United States ("the Relevant Geographic Market").

## 3M'S ANTICOMPETITIVE, UNLAWFUL, AND UNFAIR CONDUCT

14. For several years, 3M has manufactured and sold a non-linear earplug called Combat Arms. There have been four different versions of this product, but each version has used a sound channel with constrictions and openings to produce its non-linear sound attenuation effect. Such selective-attenuation sound channels are well known in the art, and they have been used for decades. These Combat Arms earplugs also have allowed the user to set the earplug for a second mode of operation, where the non-linear

6

sound channel is blocked, by inserting a plug into the channel or otherwise, so that it will then function like a traditional fully blocked earplug. This dual-mode feature is also well known in the art, and this feature was not invented by 3M, nor is it the invention claimed in any of the patents that 3M baselessly accused Moldex of infringing.

15. In 2011, Moldex introduced its own non-linear dual-mode earplug, called BattlePlug. Moldex's BattlePlug provided the first actual competition to 3M's Combat Arms earplug in the market for non-linear earplugs approved for purchase by the military. Moldex provided BattlePlug samples and pricing to the U.S. military in February of 2011, and the U.S. military gave its first order for BattlePlugs in or about May of 2011.

16. 3M wanted to block Moldex from entering this market, and 3M decided to take whatever actions it could to block the entry. Among other things, 3M decided to, and did, file suit against Moldex, in March of 2012, in United States District Court for the District of Minnesota (*3M Property & 3M Innovative Properties Company v. Moldex-Metric, Inc.*, 12-CV-611-JNE-FLN). 3M's lawsuit accused Moldex of infringing U.S. Patent No. 6,070,693 ("the '693 patent"), a patent that had been assigned to 3M some time before. However, the '693 patent claims that 3M asserted against Moldex were objectively baseless, and this must have been apparent to 3M.

17. As indicated above, non-linear earplugs that have a second mode of attenuation with the sound channel fully blocked were well known in the industry and are not the invention claimed in the '693 patent. Instead, the '693 patent identified a possible issue with the known dual-mode selective attenuation earplugs where the blocked mode was attained by inserting a plug in the sound channel or otherwise blocking it, namely,

that there may be difficulty in actually using the plug or other mechanism to block the sound channel. The '693 patent claimed an alternative way to achieve two different levels of sound attenuation in a single earplug, namely, having a dual-ended earplug, where each end was insertable into the user's ear, and each end provided a different level of attenuation. As disclosed in the patent, such an earplug would have a non-linear sound channel running from one end to a hole at the mid-point of the plug, so that exterior sound would enter through the center hole, be filtered by the sound channel, and then reach the wearer's ear in attenuated form. And the other end of the earplug could be a fully blocked earplug, or be an earplug with a channel running from the center hole to the other end of the earplug with a different sound channel structure so as to provide a different level of non-linear sound attenuation. An annotated version of Figure 2 from the '693 patent shows this dual ended structure:



18.   There is no question that the '693 patent was limited to such dual-ended earplugs. Indeed, the specification of the '693 patent makes this abundantly clear at numerous points, including the following:

> "**The present invention has two ends, that may or may not be identical, either of which can be inserted into the auditory canal, thus making it possible to**

**choose between two operating modes of attenuation that may or may not be identical."**

19. 3M did make a dual-ended version of this product for some time, but 3M has since offered a more traditional structure, where the second mode is attained by blocking the non-linear sound channel with a plug or block operated by a toggle valve.

20. Moldex's BattlePlug earplug does not infringe the '693 patent, and this was obvious from the outset. Among other reasons, Moldex's earplug is not a dual-ended earplug, the only type of earplug claimed in the '693 patent. Instead, it has only one end that can be inserted into the users' ear. Indeed, BattlePlug has the same structure as the prior art products that 3M knew about and that are described on the face of the '693 patent as prior art. The '693 patent expressly distinguishes its invention over these single-ended prior art earplugs by virtue of its dual-ended structure. For this and other reasons, the '693 patent could not possibly read on the BattlePlug earplug, and 3M must have realized this fact before they sued Moldex on the patent.

21. Further, when 3M sued Moldex on the '693 patent in March of 2012, Moldex immediately informed 3M that there was no conceivable way that its product could infringe the '693 patent. Nonetheless, 3M continued to pursue the claims against Moldex under the '693 patent, seeking, among other things, injunctive relief intended to force Moldex from the market.

22. At the same time that 3M sued Moldex over its BattlePlug earplug, 3M also asserted a separate patent claim against a different Moldex product, namely, Moldex's M-series earmuff. Specifically, as part of the patent lawsuit, 3M alleged that Moldex's M-

9

series earmuffs infringed United States Patent No. 7,036,157 (the '157 patent) owned by 3M. This patent covered an earmuff that had two separate materials on its outer surface, to limit somewhat sound transmission across the exterior muff surface. However, Moldex had first introduced its accused M-series earmuffs in 2001, almost five years before the '157 patent issued. And, because of the length of time it takes to develop such a product, 3M knew, or should have known, that Moldex had in fact invented its accused M-series earmuffs well before the priority date of the '157 patent. (Moldex is informed and believes, and alleges thereon, that 3M and its predecessor did not inform the patent office of the existence of Moldex's prior art M-series products during prosecution of the '157 patent, and that this might have been done to defraud the patent office. Moldex will seek leave to amend this complaint, to add a claim under *Walker Process* on this basis, should discovery confirm that 3M's agents committed such fraud on the PTO.)

23. When 3M sued Moldex on the '157 patent in March of 2012, Moldex immediately informed 3M of Moldex's prior invention of its accused M-series earmuffs, but 3M nonetheless pursued the claims aggressively.

24. On or about January 18, 2013, Moldex filed a motion in the patent lawsuit for summary judgment of non-infringement of the '693 patent. The hearing on that motion was set for March 21, 2013. One week before that hearing, however, and after the motion was fully briefed by both sides, 3M, seeking to avoid its claim from being adjudicated as baseless, sent Moldex a covenant not to sue, as to the '693 patent and the BattlePlug earplug. Based on this covenant, 3M took the position that the United States District Court for the District of Minnesota no longer had jurisdiction to hear the claims

relating to the '693 patent, including Moldex's dispositive motion of non-infringement, and 3M indicated its intent to obtain dismissal of its infringement claims against Moldex with respect to the '693 patent. Ultimately, 3M filed a motion to dismiss its claims with respect to the '693 patent with prejudice, and to dismiss Moldex's counterclaims of non-infringement and invalidity of the '693 patent without prejudice. On June 19, 2013, the United States District Court for the District of Minnesota dismissed 3M's claims against Moldex, under the '693 patent, with prejudice, and the Court dismissed without prejudice Moldex's claim for a declaration that it did not infringe the '693 patent.

25.     However, even after it sent its covenant not to sue Moldex on the '693 patent, 3M continued to pursue its claims against Moldex's M-series earmuffs under the '157 patent, even though it was clear that Moldex had invented its accused products prior to the invention of the '157 patent. 3M imposed great expense on Moldex in connection with 3M's pursuit of these claims, including demanding expensive, burdensome, disruptive and irrelevant document searches, as well as depositions of eight Moldex employees and former employees: Jeff Birkner, Jim Hornstein, Bernard Mishkin, Terry Grimsley, Norman Smith, Michael Scholey, Dan Dix and Steve Young. Moldex is informed and believes and alleges that 3M undertook this campaign of intense discovery in order to impose huge costs on Moldex, so as to attempt to force Moldex to settle the case, and not pursue Moldex's rights, including those asserted here, all as part of 3M's efforts to unlawfully obtain and/or maintain monopoly power.

26.     Then, in or about May of 2013, after the close of fact discovery, and as Moldex was in the process of preparing a motion for summary judgment that the '157

patent was invalid as a result of Moldex's prior invention, 3M sent Moldex another covenant not to sue, this time with respect to the '157 patent and the M-series earmuffs. Once again, 3M stated, the Court now lacked jurisdiction to determine the validity of the '157 patent, because of 3M's covenant not to sue. The parties then informed the Court of this development, and, on June 19, 2013, the United States District Court for the District of Minnesota granted 3M's request to dismiss with prejudice its infringement claims based on the '157 patent, and the Court dismissed without prejudice Moldex's claim for a declaration that the '157 patent was invalid, as that issue was mooted by the dismissal of the infringement claim.

27. In connection with 3M's dismissals of its infringement claims described above, 3M sent letters to Moldex claiming that 3M was dismissing its claims against Moldex not because they were without merit, even though that was clearly the case, but instead, because continuing the claims did not make economic sense given the size of Moldex's sales of its accused products. However, this was clearly a mere pretext, designed to try to construct a defense to the claims being asserted here. Indeed, since Moldex is continuing to sell its BattlePlug products to the U.S. military, and since 3M continues to try to interfere with those sales, it is clear that 3M did not dismiss these claims for economic reasons. Instead, 3M did so because it knew they were baseless and that it was going to lose the claims on the merits.

28. Although 3M has now abandoned both of its baseless patent infringement claims, 3M's pursuit of those claims, in bad faith, has imposed significant costs and

damages on Moldex, in the form of legal fees, costs, and lost employee time, in an amount well in excess of $1 million.

29.   Furthermore, 3M has used, and continues to use, predatory conduct in its efforts to sell into the Relevant Product Market(s). In this regard, 3M has attempted to use a federal program designed to further the use of disabled workers, called JWOD, to exclude Moldex from said Markets, by engaging in misleading assertions concerning BattlePlug and a comparison of it to Combat Arms. In addition, 3M continues to use misleading NRR ratings for its hearing protection products, based on self-testing it does in its own labs. Specifically, 3M continues to sell its dual-ended version of Combat Arms with an NRR rating of zero in the open or unblocked position, thus suggesting that the open earplug will not in any way impair the sounds one hears from fellow soldiers or combatants in the field. This zero rating is based upon an improper testing effort, not in compliance with proper procedures. Indeed, in the reported underlying test, 3M basically concluded that the Combat Arms earplug would actually enhance the sound level of the wearer as compared to wearing no earplug at all. Although 3M has asserted that the "0" NRR rating is not a violation of the Noise Control Act, 42 U.S.C. § 4901, because, 3M claims, an understatement of sound attenuation is not prohibited by that Act, it is nonetheless the case that this advertised rating is intended to inform the military that Combat Arms does not diminish the ability to hear commands, or approaching combatants or vehicles. As a result, the "0" NRR rating is highly misleading, misleads users of the plug, and anticompetitive. Moldex, on the other hand, elected over 15 years

ago to test all of its hearing protection products in an independent, industry-recognized audiology laboratory to assure that its advertised NRR ratings are accurate.

## First Claim For Relief

## Sham Litigation: Monopolization and Attempted Monopolization

## Under 15 U.S.C. §§ 2

30. Moldex restates and incorporates herein by reference paragraphs 1-29 of this Complaint, as though fully set forth herein.

31. 3M's patent lawsuit, and in particular, the claims asserted under the '693 patent therein, were objectively and subjectively baseless. These meritless claims were brought by 3M in bad faith as an anticompetitive weapon to attempt to force Moldex from the Relevant Product Market and to attempt to interfere directly with Moldex's business relationships. Further, 3M pursued its claims under the '157 patent with full knowledge that those claims were invalid, for improper and anticompetitive reasons, including to put financial pressure on Moldex and thereby to force it to accede to 3M's demands, and to cease selling its BattlePlug products, and to prevent it from asserting the claims asserted herein.

32. By virtue of the foregoing, 3M has sought to maintain its monopoly power in the Relevant Market(s), and/or it has attempted to monopolize such Market(s) and there is a dangerous probability that, but for the acts of Moldex in fighting the baseless litigation, 3M would have succeeded in its scheme.

33. Moldex has been damaged in its business and property by virtue of these acts by 3M, in an amount to be proven at trial, but believed to be in excess of $1 million.

Under 15 U.S.C. §15, Moldex is entitled to treble the amount of its antitrust damages. In addition, by virtue of this same section, Moldex is entitled to its fees and costs incurred in bringing and pursuing this antitrust action.

## Second Claim For Relief

## Malicious Prosecution

34.  Moldex restates and incorporates herein by reference paragraphs 1-33 of this Complaint, as though fully set forth herein.

35.  By suing Moldex on the '693 patent, and by suing Moldex on the '157 patent or by continuing with that suit even after it had been fully informed of Moldex's prior invention, 3M brought and/or pursued litigation claims that were objectively baseless and that 3M knew were baseless.

36.  Moldex is informed and believes, and alleges thereon, that, in undertaking these actions, 3M has caused damage to Moldex, including Moldex's defense costs in defending against both the '693 and the '157 patent claims in the patent lawsuit, and the disruption to Moldex's business as a result that predatory litigation. Further, Moldex is informed and believes and alleges thereon that 3M's acts were willful, wanton, malicious and oppressive, in that 3M was motivated by malicious intent and ill will and an improper desire to exclude Moldex from a market in which 3M profited mightily. Therefore, Moldex reserves the right, consistent with the legal standards for such a claim, to move to amend Moldex's complaint to seek an award of punitive damages.

37.  3M's patent lawsuit against Moldex was terminated in Moldex's favor based on 3M's voluntary dismissal of its claims.

## Third Claim for Relief

## Unfair Competition Under Cal. Bus. and Prof. Code § 17200

38.  Moldex restates and incorporates herein by reference paragraphs 1-37 of this Complaint, as though fully set forth herein.

39.  The acts of 3M, as herein alleged, constitute unlawful, unfair and deceptive business practices in violation of California Business and Professions Code §17200 *et seq*. Such acts include, without limitation, 3M's initiation and prosecution of groundless litigation, 3M's unlawful distribution and sale of Combat Arms earplugs with an advertised NRR of zero or advertisements suggesting that a user's hearing or situational awareness are unaffected in violation of federal and state law, 3M's unfair competition and false advertising in connection with the marketing and sale of Combat Arms earplugs in violation of California Business and Professions Code § 17500 *et seq.*, and 3M's deceptive statements regarding the open end of the Combat Arms earplugs as alleged above.

40.  As a result of 3M's conduct, Moldex has suffered and will continue to suffer damage to its business, reputation, and goodwill.

41.  3M's conduct has caused, and unless enjoined by this Court, will continue to cause, immediate and irreparable harm to Moldex for which there is no adequate remedy at law, and for which Moldex is entitled to injunctive relief.

## Prayer for Relief

WHEREFORE, for its prayer for relief, Moldex prays for judgment as follows:

1.   On Moldex's First claim for relief, for treble Moldex's damages, according to proof at trial, and for Moldex's attorneys' fees and costs incurred in pursuing said claim, in accordance with the antitrust laws of the United States;

2.   On Moldex's First claim for relief, a permanent injunction enjoining Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from conducting future predatory acts of monopolization, including the use of misleading NRR numbers and the use of improper testing procedures;

3.   On Moldex's Second claim for relief, for actual damages according to proof at trial, and for punitive damages according to proof at trial;

4.   On Moldex's Third claim for relief, that 3M and all of its respective officers, agents, servants, representatives, employees, attorneys, and all other persons acting in concert with them be permanently enjoined from:

   a.   directly or indirectly engaging in false advertising, marketing and/or promotions of any kind relating to the ostensibly non-sound attenuating yellow "open" end of the Combat Arms earplug;

   b.   making or inducing others to make any false, misleading or deceptive statement of fact, or misrepresentation of fact in connection with the marketing, promotion, sale, offering for sale, manufacture, production, or distribution of Combat Arms earplugs;

5.   On Moldex's Third claim for relief, for a determination that 3M be adjudged to have violated California Business and Professions Code § 17200 et seq. by

unlawfully and unfairly competing against Moldex and be enjoined from further such violations;

6. On all claims, for prejudgment interest;

7. On all claims, for attorneys' fees and costs; and

8. For such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Date: June 5, 2014

By: s/Kevin D. Conneely
Kevin D. Conneely (MN #192703)
Katherine A. Moerke (MN #312277)
STINSON LEONARD STREET P.A.
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657
kevin.conneely@stinsonleonard.com
katie.moerke@stinsonleonard.com

AND

Harold A. Barza
(California Bar No. 80888) (*pro hac vice application to be submitted*)
halbarza@quinnemanuel.com
Joseph M. Paunovich
(California Bar No. 228222) (*pro hac vice application to be submitted*)
joepaunovich@quinnemanuel.com
Matthew Hosen (California Bar No. 291631) (*pro hac vice application to be submitted*)
matthosen@quinnemanuel.com QUINN EMANUEL URQUHART

                                 & SULLIVAN, LLP
865 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3211
halbarza@quinnemanuel.com
roberthill@quinnemanuel.com

**ATTORNEYS FOR PLAINTIFF
MOLDEX-METRIC, INC.**