UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MOLDEX METRIC, INC., | CASE NO. 0:14-cv-01821-JNE-FLN |
| Plaintiff, | **MOLDEX'S MEMORANDUM OF LAW IN OPPOSITION TO 3M'S MOTION TO DISMISS** |
| vs. | |
| 3M COMPANY and 3M INNOVATIVE PROPERTIES COMPANY, | |
| Defendants. | |

## Introduction

3M engaged in sham patent litigation in this Court.[1] In 2012, 3M sued its much

smaller rival, Moldex-Metric, Inc. ("Moldex"), asserting a patent infringement claim

against Moldex's just-introduced selective-attenuation earplug—a specialized type of

military earplug used to protect soldiers from the harmful effects of battlefield

explosions, while still allowing them to hear fellow soldiers nearby. By this tactic, 3M

sought to drive Moldex from the market and maintain 3M's monopoly power there. But

when Moldex stood its ground, and filed a motion for summary judgment that displayed

the absurdity of 3M's patent claim, 3M ran for the hills. 3M proffered a covenant not to

---

[1] 3M is no stranger to bad faith patent litigation. Earlier this year, a federal district court in New Jersey entered judgment against 3M for violating the Sherman Act by asserting patent claims against a smaller rival in bad faith in an effort to drive that rival from the market. *See TransWeb, LLC v. 3M Innovative Properties Co.*, 10-4413 FSH JBC, 2014 WL 1577557 (D.N.J. Apr. 21, 2014).

sue and then argued the case was moot, depriving the court of jurisdiction to rule on Moldex's summary judgment motion. Having suffered significant injury from 3M's bad faith patent suit and other identified wrongful conduct, Moldex commenced the present action to recover damages for those losses, as well as to obtain injunctive relief against certain false advertising claims made by 3M concerning its selective-attenuation earplug products.

3M has now moved to dismiss Moldex's entire Complaint. 3M's arguments are without merit, however, and its motion to dismiss should be denied.

3M argues that Count One (for monopolization and attempted monopolization) is deficient, because the Complaint fails to allege antitrust injury, fails to allege that the prior litigation was objectively and subjectively baseless, and fails to allege a relevant product market or 3M's power in that market. However, it is well settled that an antitrust claim can be based on bad faith patent litigation, even if that litigation is unsuccessful in driving the victim from the market. In such circumstances, the antitrust injury is present because the scheme, had it succeeded, would have had significant market impact. And, in such circumstances, legal fees incurred in defending against the prior bad faith litigation are recoverable as antitrust damage.

Similarly, Moldex has set forth more than enough facts to meet its burden, at the pleading stage, of alleging the objective and subjective baselessness of the prior patent litigation. The Complaint explains in detail why the claims that 3M asserted against Moldex's earplugs were objectively baseless—the subject patent could not possibly be read in good faith as applying to Moldex's accused products. Further, the Complaint

894.23795/6146631.1

102122706v1

pleads more than enough facts supporting its assertion of subjective baselessness, including the timing of the baseless patent claims, the dropping of them just prior to the summary judgment hearing, and the pretext given for walking away.

Likewise, the Complaint properly alleges a plausible product market and 3M's market power. The Complaint identifies the relevant product market as that for selective-attenuation earplug products that provide a unique set of attributes without reasonable substitutes in a specialized market. This more than suffices to meet Moldex's burden of pleading a relevant product market. 3M has not identified any other more appropriate product market, nor any substitutes that are not included in this product market definition. Nor does 3M deny its dominant market share in this market, or that, had its prior lawsuit succeeded, 3M would have maintained or enhanced that market power.

3M also attacks Moldex's malicious prosecution claim (Count Two) on the ground that if Moldex's antitrust claim is deficient in alleging that the prior claim(s) were baseless, then so too does this claim. But, as shown above, the antitrust claim is sufficiently alleged. Hence, the malicious prosecution claim is also adequately pled.

3M next attacks the California Unfair Competition Law ("UCL") averments (Count Three) that seeks only injunctive relief, arguing that, to the extent the claim is based on the antitrust claims, the UCL claim falls with them. 3M further erroneously contends that, to the extent based on misleading advertising used by 3M to market its selective-attenuation earplugs, the UCL claim fails because 3M's advertising is not misleading, is permitted by federal regulations governing certain noise measurements, and is time-barred. However, these arguments are similarly meritless: 3M continues to

tell buyers, misleadingly, that the 3M earplugs have a noise reduction of "zero" when in the selective-attenuation or "open" mode, thus indicating that the wearer can hear as well with the earplugs in as without them. In fact, the earplugs do cause sound attenuation even in the "open" position, and 3M's marketing is misleading and dangerous. As a result, the claim is adequately pled and is not preempted by federal noise labeling regulations. Further, because 3M continues to make these misleading product claims, Moldex's claim is not time-barred.

As its final assault upon Moldex's Complaint, 3M wrongly asserts that it is barred by Minnesota's anti-SLAPP statute. First, by its plain language and established precedent, this statute cannot apply to Moldex's statutory unfair competition claims or federal antitrust claims. Only the malicious prosecution claim is implicated. Second, as a global, patent-wielding behemoth, 3M has not shown that it was even engaged in "public participation" when it brought, then dropped, the prior lawsuit, a necessary prerequisite to the applicability of that law. Third, applying Minnesota's SLAPP statute, with its irregular procedural requirements, would run afoul of various constitutional provisions and the Federal Rules of Civil Procedure. Finally, Moldex is submitting herewith evidence to substantiate the clearly meritorious nature of its claims, and, to the extent there is anything lacking therein, it is entitled to conduct discovery for additional evidence showing that the anti-SLAPP statute does not immunize 3M from Moldex's malicious prosecution claim.

894.23795/6146631.1

102122706v1

## Factual Background[2]

This action involves selective-attenuation earplugs used by the U.S. Military to protect soldiers' hearing from the harmful effects of battlefield gunfire and explosions. By using a sound channel that has various constrictions and openings for the passage of sound from the exterior to the wearer's ear canal, these non-linear earplugs block sounds of different amplitude and frequency to differing degrees. As a result, they are worn by soldiers to protect against intense impulse sounds of battlefield explosions, while still allowing soldiers the ability to communicate with their colleagues nearby. (Compl. ¶ 8). These earplugs also can have a second setting, whereby a plug is inserted into and blocks the selective-attenuation sound channel, thereby giving greater protection to the wearer, though without the selective-attenuation functionality. (*Id.*).

The vast majority of the selective-attenuation earplugs are purchased by the U.S. Military. (Compl. ¶ 9). The military may only purchase these products in significant quantities if they are approved under standards required by the U.S. military services. (*Id.*).

Until 2011, 3M was the sole significant supplier of these earplugs to the military. (Compl. ¶ 15). In 2011, however, Moldex, a privately-held safety-products manufacturer, introduced its own selective-attenuation earplug called BattlePlug and obtained approval to sell it to the Army, which placed its first order for BattlePlugs in

---

[2] Because this is a motion to dismiss under Rule 12(b)(6), the allegations of the complaint are to be taken as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

894.23795/6146631.1
102122706v1

that year. (Compl. ¶ 15). With its monopoly threatened, 3M determined to drive Moldex from the market. 3M did so by filing a patent infringement suit against Moldex in this District in March 2012, accusing Moldex's BattlePlug of infringing a 3M patent, U.S. Patent No. 6,070,693 ("the '693 patent"). (Compl. ¶ 16). If successful, this lawsuit would have excluded Moldex from the market.

However, this lawsuit was baseless and not brought in good faith. Instead, it was brought to interfere with Moldex's relationship with the Army and to force Moldex to exit the market to avoid the burden of expensive patent litigation. (Compl. ¶¶ 16, 25). The '693 patent has nothing to do with the accused BattlePlug product. The '693 patent claims as its invention a dual-ended earplug, where a channel runs from each end of the earplug to a hole in the middle, with different filters or attenuation structures at the end of each sound channel, so that a wearer can change the attenuation depending on which end is placed in the wearer's ear. The patent is crystal clear that its invention is such a dual-ended earplug. An annotated version of Figure 2 from the '693 patent, included in the Complaint, shows this dual-ended structure:

*Sound enters from outside through middle hole





( Compl. ¶ 17).

Further, the specification of the '693 patent makes it abundantly clear, at numerous places, that its invention is limited to such a dual-ended earplug:

> The present invention has two ends, that may or may not be identical, either of which can be inserted into the auditory canal, thus making it possible to choose between two operating modes of attenuation that may or may not be identical.

(Compl. ¶ 18).

Indeed, BattlePlug has the same structure as the single-ended selective-attenuation earplugs that are expressly distinguished at the beginning of the '693 patent as the prior art that the dual-ended plug was designed to improve on. (Compl. ¶ 20). For this and other reasons, the '693 patent could not possibly read on the BattlePlug, and 3M undoubtedly knew this before it sued Moldex on the patent.

Perhaps wanting to hide the baselessness of its '693 patent infringement claim and to add to the financial burden for Moldex to enter the selective-attenuation earplug market, 3M alleged the infringement of another 3M patent, United States Patent No. 7,036,157 ("the '157 patent"), against Moldex's M-series earmuffs that Moldex had been

selling for almost a decade.[3] (Compl. ¶ 22). Moldex had first introduced its accused M-series earmuffs in 2001, almost five years before the '157 patent issued. And, because of the length of time it takes to launch a new product, 3M knew, or should have known, that Moldex had invented its accused M-series earmuffs well before the priority date of the '157 patent.

From the outset, Moldex advised 3M that the suit was baseless: the '693 patent could not read on the BattlePlug product; and, if the '157 patent read on Moldex's M-Series earmuffs, then that patent was invalid. (Compl. ¶¶ 21, 23). 3M insisted on pursuing its claims however, imposing great costs on Moldex. (Compl. ¶ 25 ).

In January of 2013, Moldex filed a motion for a summary determination of non-infringement of the '693 patent. (Compl. ¶ 24). The hearing was set for March 21, 2013. One week before that hearing, however, and after the motion was fully briefed by both sides, 3M abruptly and without discussion sent Moldex a covenant not to assert the '693 patent against the BattlePlug earplug. (Compl. ¶ 24). Based on this covenant, 3M asserted that this Court no longer had jurisdiction to hear those claims. In the subsequent dismissal proceedings, Moldex expressly reserved its right to sue 3M based thereon. (3M's Motion to Dismiss ("Mot.") at 6 n.4).

Even after 3M dropped the '693 claim, it persisted in pursuing its '157 claim. 3M deposed numerous Moldex employees, imposing significant costs on Moldex. Then, as

---

[3] An earmuff is a hearing protector that covers the entire exterior of the wearer's ear. (Compl. ¶ 10).

894.23795/6146631.1

102122706v1

Moldex was preparing a motion for summary determination as to the '157 patent, 3M sent Moldex a covenant not to assert the '157 patent. (Compl. ¶ 26). Again, a dismissal proceeding followed in which Moldex expressly reserved its rights to sue 3M for its bad faith litigation. (Mot. at 6-7).

Moldex now brings the present action against 3M and its patent-holding affiliate, 3M Innovative Properties (collectively "3M"), for 1) monopolization and attempted monopolization under section 2 of the Sherman Act, 2) malicious prosecution, and 3) unfair competition under California's UCL. The Complaint seeks damages for the first two claims, but only injunctive relief for the third claim.

## ARGUMENT

3M moves to dismiss the Complaint, pursuant to Rule 12(b)(6), on multiple bases. However, none of these grounds has merit, and 3M's motion must be denied.

## I.   The Complaint Adequately Alleges a Claim for Monopolization and Attempted Monopolization.

Moldex has asserted a claim against 3M for monopolizing and attempting to monopolize the market for selective-attenuation earplugs, both as to the market for such products generally and with respect to the submarket for the U.S. Military's purchases of such products.

It is well-established that a claim for monopolization and attempted monopolization can be based on sham litigation brought in bad faith to exclude a competitor from a relevant market, where the effect of the litigation, if successful, would be to acquire or maintain monopoly power in that market, or create a dangerous

894.23795/6146631.1

102122706v1

probability of same. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1992); *see also Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1034-36 (C.D. Cal. 2007); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1072-73 (Fed. Cir. 1998). Moldex has asserted just such a claim here.

3M argues that Moldex's antitrust claims must be dismissed because the Complaint (1) does not sufficiently allege antitrust injury, (2) does not sufficiently allege that 3M's patent lawsuit was objectively and subjectively baseless, and (3) does not sufficiently allege a relevant product market or market power. (Mot. at 8-19). These arguments all fail.

"The liberal rules of pleading embodied in Fed. R. Civ. P. 8 are as applicable to claims in antitrust … cases as they are in any other case; … All that is required is a short, plain statement of facts sufficient to give the defendant fair notice of the basis of the claim." *Baxley-DeLamar Monuments, Inc. v. Am. Cemetery Ass'n*, 843 F.2d 1154, 1156 (8th Cir. 1988) (internal quotation omitted); *see also UltiMed, Inc. v. Becton, Dickinson and Co.*, 2007 WL 128834 at *1 (D. Minn. Jan. 12, 2007) (an antitrust claimant need only allege "more than mere legal conclusions"). Nor does *Twombly* alter this standard; instead, *Twombly* merely requires that Moldex plead "enough facts to state a claim … that is plausible on its face." *Twombly*, 550 U.S. at 547. Moldex has done that here.

### A.    Moldex's Litigation Expenses Are Recoverable as Antitrust Damages.

3M argues that legal fees incurred in defending against sham litigation are not recoverable as antitrust damages because they do not involve harm to competition,

merely harm to a competitor. (Mot. at 9-12). Because "Moldex continues to sell its product" and "because the Complaint contains no allegations of diminution in competition," 3M argues Moldex "cannot establish antitrust injury" and Moldex's defense costs are not recoverable. (Mot. at 9-10). However, 3M's argument is based on a mischaracterization of "antitrust injury" and of the relationship of such injury to recoverable antitrust damages. (Mot. at 8-12).

"Antitrust injury" is a required element of antitrust standing, and, as 3M correctly notes, antitrust injury must "be of the type that the antitrust laws were intended to prevent." (Mot. at 9) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (finding that Brunswick *increased* competition by acquiring failing bowling centers, which did not amount to antitrust injury to other competitors)). The focus of this inquiry is whether an antitrust defendant's conduct caused, or could have caused, harm to competition.

In the attempted monopolization context, "[t]he relevant test [for antitrust injury] is whether the 'dangerous probability of success,' *if it had materialized*, would have caused the type of market damage the antitrust laws seek to prevent." *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 994 (5th Cir. 1983) (emphasis in original); *see also Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 807 (8th Cir. 1987) (a plaintiff need not "prove an actual lessening of competition in order to recover [antitrust damages]"); *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 374 (6th Cir. 1977) (in a section 2 antitrust action, a party targeted by sham litigation need not prove that direct marketplace damages resulted from the anticompetitive act).

894.23795/6146631.1

102122706v1

Recoverable antitrust damages are a subset of antitrust injury. They include any harm suffered by the plaintiff that "flows" from the anticompetitive conduct. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 483 (3d Cir. 1998) (the proof for antitrust damages is whether "*some* damage flow[s]" from the anticompetitive conduct) (emphasis in original).

Moldex's Complaint alleges that 3M engaged in a sham litigation scheme that, had it been successful, would have coerced Moldex to leave the market, thereby maintaining 3M's monopoly power. This sufficiently asserts the harm to competition required for antitrust injury. And Moldex's defense costs flow from this anticompetitive conduct—but-for 3M's sham lawsuit, Moldex would not have incurred those attorneys' fees. (Compl. ¶¶ 21, 25, 28).

It is well-established that parties targeted by baseless lawsuits can recover their attorneys' fees incurred in defending against such suits, if the other elements of a section 2 claim are met. *See, e.g.*, *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979) ("the costs incurred in defense of the prior patent infringement suit are an injury which 'flows' from the antitrust wrong."); *see also Kearney & Trecker*, 562 F.2d at 374 ("When the antitrust violations are causally connected to the infringement action it is permissible to include the expenses of defending that action in the award of damages."); *Rickards v. Canine Eye Registration Found.*, 783 F.2d 1329, 1334-35 (9th Cir. 1986) (defendant's "sole damage claim" of attorneys' fees constituted valid antitrust damages). Indeed, 3M litigated and lost this very same issue only a few months ago in *TransWeb*, 2014 WL 1577557, in which 3M was held liable for monopolization and attempted

monopolization based on its bad faith assertion of patents obtained by fraud on the patent office.

The two cases cited by 3M, *Razorback Ready Mix Concrete Co., Inc. v. Weaver*, 761 F.2d 484 (8th Cir. 1985), and *Wildenauer v. Blue Cross & Blue Shield of Minnesota*, 737 F. Supp. 64, 66 (D. Minn. 1989), are inapposite. Neither governs the issue raised by 3M.[4]  And, contrary to 3M's baffling insinuation that sham litigation claims are somehow disfavored outside the pharmaceutical arena, none of the aforementioned cases involved pharmaceutical drugs.[5]  (Mot. at 10).

### B.     3M's Prior Patent Lawsuit Was Objectively and Subjectively Baseless.

3M argues that it is entitled to immunity under the *Noerr-Pennington* doctrine. But that doctrine does not apply to litigation that is objectively and subjectively baseless. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed. Cir. 1998); *see also* Areeda & Hovenjamp, *Antitrust Law* ¶ 706a (3d ed. 2006) (engaging in "sham" litigation is not protected by the *Noerr-Pennington* doctrine); *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1154-55 (7th Cir. 1983) (a single baseless

---

[4] In *Razorback*, the court described the prior lawsuit underlying plaintiff's sham litigation claim as "legitimate" and not objectively baseless. *Razorback*, 761 F.2d at 487. Furthermore, the plaintiff had not pled a relevant market or any effect on competition (actual or threatened). *Id.* at 448.  Neither issue is applicable to the present case. In *Wildenauer*, the defendant was a purchaser of health care, not a provider of health care, and defendant's purchasing decisions did not harm competition. *Wildenauer*, 737 F. Supp. at 67. *Wildenauer* is inapplicable to the present case, where 3M and Moldex are direct competitors. (Compl. ¶ 15).

[5] 3M also asserts that Moldex's Complaint is "simply an untimely fee application." (Mot. at 11). However, Moldex was under no obligation to seek attorneys' fees in the prior patent lawsuit.

claim can serve as grounds for sham litigation); *Novelty, Inc. v. Mountain View Mktg., Inc.*, No. 07-1229, 2010 U.S. Dist. LEXIS 30783, at *2 n.2 (S.D. Ind. Mar. 30, 2010) (same).

3M asserts that Moldex cannot invoke the sham exception because the Complaint fails to establish that 3M's lawsuit was objectively and subjectively baseless. (Mot. at 12-15). Although 3M disputes Moldex's allegations surrounding the '157 patent infringement claim, (Mot. at 14), 3M makes no specific reference to the '693 infringement allegations. (Mot. at 12-15). Instead, 3M relies primarily on a supposed heightened pleading standard for sham litigation claims. Even if such a pleading standard applied, the Complaint sufficiently alleges that 3M's patent lawsuit falls within the *Noerr-Pennington* doctrine's "sham exception."

### 1.    3M's Patent Lawsuit Was Objectively Baseless.

A lawsuit is objectively baseless if "no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors*, 508 U.S. at 60. When the "predicate facts of an allegedly sham lawsuit are disputed, sham litigation claims should not be decided by the court as a matter of law." *In re Gabapentin*, 649 F. Supp. 2d at 363 (citation omitted). Moldex's Complaint alleges sufficient facts such that a finder of fact could properly conclude that 3M's patent lawsuit was objectively baseless.

The '693 Patent is limited to dual-ended earplugs. This is clear from the specification. Yet 3M baldly asserted the patent against Moldex's single-ended BattlePlug, a product that could not possibly be alleged in good faith to fall within the scope of that patent. Further, even a cursory investigation would have revealed that

BattlePlug's one-ended structure was essentially identical to the prior art products described as prior art in the '693 patent. (Compl. ¶¶ 17-20).[6]

*In re Gabapentin* is informative. In *Gabapentin*, a generic drug manufacturer was sued by the owner of a drug patent. *In re Gabapentin*, 649 F. Supp. 2d at 343-44. Generic asserted a counterclaim alleging that patentee's claims were sham, as the patentee had failed to investigate the accused product before commencing suit and that evidence disclosed in prior discovery proved that the generic drug did not infringe. *Id.* at 345-46, 353. The court held that the generic manufacturer adequately alleged the sham exception to *Noerr-Pennington* immunity:

> The resolution of the question whether plaintiffs' suit is objectively baseless … involves the determination of whether plaintiffs undertook a reasonable investigation before filing suit, whether plaintiffs knew or should have known that [there was no patent infringement], and whether a reasonable litigant could have realistically expected success on the merits at the time the suit was filed. Reasonableness is a question of fact, and the Court cannot make such factual determinations on a factual controversy roiled by a motion to dismiss.

*Id.* at 363-64 (internal citation omitted); *see also Catch Curve*, 519 F. Supp. 2d at 1037 (refusing to dismiss a sham litigation claim on objective baselessness grounds because of questions of fact) (citing *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,

---

[6] The essence of Moldex's antitrust claim is that 3M brought the '693 claim in bad faith, to interfere with Moldex's relationship with the U.S. Military and force Moldex from the market through burdensome litigation costs. Perhaps to distract from the baselessness of its '693 claim, 3M also claimed that Moldex's M-series earmuffs infringed the '157 patent. By imposing even greater litigation costs on Moldex, this additional '157 claim furthered 3M's goal of unlawfully obtaining or maintaining monopoly power in the selective-attenuation earplug market. As alleged in the Complaint, (Compl. ¶¶ 22-23), the '157 claim was also baseless, and 3M must have known this when the claims were filed.

690 F.2d 1240, 1253 (9th Cir. 1982)); *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300,

310 (E.D. Pa. 2011) ("The question whether a petition is a sham is generally a question of

fact for the jury.") (citing *Indep. Taxicab Drivers' Employees v. Greater Houston Transp.

Co.*, 760 F.2d 607, 612 n.9 (5th Cir. 1985)).

Moldex's Complaint sufficiently alleges that 3M's '693 claim was objectively

baseless— even a cursory investigation would have revealed that the patent could not

possibly read on the BattlePlug. (Compl. ¶ 20).  Moldex immediately informed 3M that

BattlePlug could not infringe the '693 patent, yet 3M continued pursuing its infringement

claim, which even sought injunctive relief.  (Compl. ¶ 21).

### 2. 3M's Patent Infringement Claims Were Subjectively Baseless.

In evaluating subjective baselessness, "the court should focus on whether the

baseless lawsuit conceals 'an attempt to interfere directly with the business relationships

of a competitor,' through the 'use [of] the governmental process … as an anticompetitive

weapon.'" *Prof'l Real Estate Investors*, 508 U.S. at 60-61 (citations omitted).  Moldex's

Complaint sufficiently alleges subjective baselessness. It alleges that 3M's patent lawsuit

was simply a poorly concealed attempt to disrupt Moldex's selective-attenuation earplug

business, so that Moldex would not be able to compete with 3M in supplying selective-

attenuation earplugs to the U.S. Military, or any other segments of the broader selective-

attenuation earplug market. (Compl. ¶¶ 21-28).  3M never expected to win its patent

lawsuit on the merits, but instead sought to coerce Moldex from the market through

burdensome litigation, thereby maintaining its monopoly power. (*Id.*).

894.23795/6146631.1

102122706v1

Furthermore, determining a patentee's motive in bringing a infringement claim is a fact-intensive inquiry, and courts are reluctant to decide this issue at the pleading stage. *See TransWeb, LLC v. 3M Innovative Properties Co.*, CIV.A. 10-4413 FSH, 2011 WL 2181189, at *16 (D.N.J. June 1, 2011) ("when the predicate facts of an allegedly sham lawsuit are disputed, sham litigation claims should not be decided by the court as a matter of law.") (citations omitted); *see also Sheet Metal Workers' Int'l Ass'n, Local No. 355 v. N.L.R.B.*, 716 F.2d 1249, 1261 (9th Cir. 1983) (questions of subjective motivation are questions of fact).

Further, there is powerful circumstantial evidence supporting a finding of subjective baselessness. The U.S. Military purchases the vast majority of selective-attenuation earplugs in the United States, and up until 2011, 3M held a virtual monopoly in selling these earplugs.[7] (Compl. ¶¶ 9, 15). Then, shortly after the military made its first-ever order for Moldex's BattlePlugs, in May of 2011, 3M sued Moldex asserting the '693 patent. (Compl. ¶¶ 15-21). Even after Moldex told 3M that its infringement claims were baseless, 3M continued aggressively pursuing burdensome and expensive discovery, and even went so far as to seek injunctive relief in its complaint to block Moldex from the market. (Compl. ¶ 21). These factual allegations surrounding the timing

---

[7] Moldex has been made aware and believes that, besides Moldex entering the market for selective-attenuation earplugs approved for purchase by the military, a third company, Surefire LLC, has entered the market. However, Moldex further understands that discovery will show that Surefire's sales to the military have been minimal.

and circumstances of 3M's initiation of its patent lawsuit are strong evidence that 3M brought the suit in bad faith.

Additionally, the circumstances surrounding 3M's dismissal of its claims are further powerful evidence of objective and subjective baselessness. (Compl. ¶¶ 24-27). One week before a summary judgment hearing, with motions fully briefed by both sides, 3M sent Moldex a covenant not to assert the '693 patent against BattlePlug. (*Id*.) 3M's '693 claim was subsequently dismissed with prejudice, but not before 3M sent Moldex a letter claiming that 3M was dismissing its claims "not because they were without merit," but because "continuing the claims did not make economic sense given the size of Moldex's sales of its accused products." (Compl. ¶ 27). This explanation is not credible. Moldex was a new entrant in a lucrative market over which 3M had held a virtual monopoly prior to 2011. As a result of Moldex entering the market, 3M now would have to compete with a rival supplier offering a superior product at a lower price.  Not only have Moldex's sales been significant, but over time, Moldex's sales would likely grow substantially. Why then, would 3M give a covenant not to sue, foregoing future injunctive relief, and dismiss its claims with prejudice, with future sales thus open to Moldex? 3M's purported "economic" explanation was simply a pretext designed to hide 3M's objectively and subjectively baseless litigation scheme, and to try to immunize itself from liability for its wrongful conduct. But such an incredible excuse is itself powerful proof that the suit was, from the outset, a sham intended to drive a competitor from the market.

894.23795/6146631.1

102122706v1

**C.      The Complaint Sufficiently Identifies Relevant Markets And Has Sufficiently Alleged That 3M Had Monopoly Power.**

3M argues that the Complaint fails to adequately plead a relevant market in support of its monopolization claim. (Mot. at 16-19). 3M is wrong. The Complaint sufficiently alleges several relevant product markets, a relevant geographic market, and all other elements of a valid section 2 monopolization and attempted monopolization claim.

**1.      The Complaint Sufficiently Alleges Plausible Relevant Markets.**

A relevant market has two components: a product market and a geographic market. *Minnesota Made Hockey, Inc.*, 789 F. Supp. 2d at 1145. "The relevant product market includes all reasonably interchangeable products," and "[t]he geographic market is defined by considering the commercial realities faced by consumers." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 06-CV-0466 PJS/RLE, 2007 WL 4465195, at *5 (D. Minn. Dec. 18, 2007) (citing *Double D Spotting Serv.*, 136 F.3d at 560). For pleading purposes, a plaintiff may allege facts supporting "a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes." *Id.* at *7 (citations omitted). "A dismissal on the pleadings should be granted sparingly and with caution ... [because] often, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Minnesota Made Hockey, Inc. v. Minnesota Hockey, Inc.*, 789 F. Supp. 2d 1133, 1145 (D. Minn. 2011) (citation omitted).

94.23795/6146631.1

102122706v1

The Complaint in this case sufficiently alleges at least three relevant product markets: (1) "non-linear earplugs that are approved for purchase by the United States military," (2) the general market for non-linear earplugs, and (3) "non-linear earplugs that have dual modes of setting." (Compl. ¶ 12).

In the limited cases where courts have questioned a product market at the pleading stage, it has been because the alleged market appeared to exclude products that were obvious substitutes—for example, limiting a market to the products of a single manufacturer or franchisor.  Here, however, there are no reasonable substitutes for selective-attenuation earplugs, and 3M does not identify any. Selective-attenuation earplugs serve a demanding function: to protect users from loud explosions, while at the same time, allowing them to verbally communicate with their colleagues. Clearly ordinary earplugs are not an acceptable substitute, and they would not comply with the military's performance requirements. (Compl. ¶ 15).

Traditional, fully-blocked earplugs are not a reasonable substitute; not only because they do not comply with the military testing standards, but also because soldiers would have to remove the traditional earplugs, in the heat of battle, every time they needed to communicate verbally with their colleagues. Due to the strict testing standards, only two sellers were authorized to sell selective-attenuation earplugs to the U.S. Military at the time of the events in question: 3M and Moldex. (Compl. ¶ 15). Thus, the Complaint sufficiently alleges a relevant product market for non-linear earplugs that are approved for purchase by the U.S. Military. Alternatively, and for similar reasons, the

Complaint sufficiently alleges a relevant product market for selective-attenuation earplugs in general, and for such earplugs with dual-mode functionality. (Compl. ¶ 12).

In regard to the relevant geographic market, because the U.S. military purchases the vast majority of selective attenuated earplugs, and because these transactions occur in the U.S., Moldex has alleged a viable relevant geographic market that considers the commercial realities faced by consumers. (Compl. ¶ 13).

3M's product-market cases are off-target. (Mot. at 17.) In *Golden Gate*, the plaintiffs alleged a product market of "the pharmaceutical industry." *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) (unpublished). Central to the court's three-paragraph opinion was that the complaint "fail[ed] to state *any* facts indicating that all pharmaceutical products are interchangeable for the same purpose." *Id*. (emphasis in original). Not so in the present case, where the relevant markets alleged in the Complaint relate to a particular type of earplug that has highly specific performance characteristics and for which there are not reasonable substitutes.

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), is equally inapposite. (Mot. at 17). There, the Court rejected a product market "for ingredients … *used in the operation of Domino's stores*." *Id.* at 437 (emphasis added). The court held that the ingredients "used by Domino's stores are interchangeable with [ingredients] used by other pizza companies," and therefore, the relevant product market could not be "restricted solely to those products currently approved by Domino's Pizza, Inc. for use by Domino's franchisees." *Id.* at 438.

894.23795/6146631.1

102122706v1

Unlike pizza dough, a commodity, selective-attenuation earplugs approved for use by the U.S. Military and others are not reasonably interchangeable with other types of earplugs. *Queen City Pizza* is simply not relevant to the present case.

Finally, in *Re-Alco Industries*, the court found that plaintiff could not properly allege a specific brand of elementary school health education materials as a relevant product market. *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993). Here, on the other hand, the Complaint explains why selective-attenuation earplugs are considered "a market unto themselves," as distinguished from other hearing protection products.

### 2.      The Complaint Sufficiently Alleges Monopoly Power.

3M next argues that the Complaint does not sufficiently allege monopoly power. (Mot. at 16-18). In proving monopoly power, a plaintiff may present "circumstantial evidence of monopoly power by showing a high market share within a defined market." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (citations omitted); *see also Netflix, Inc. v. Blockbuster, Inc.*, 2006 WL 2458717 (N.D. Cal. Aug. 22, 2006) (antitrust claimant sufficiently alleged monopoly power with claim that infringement plaintiff possessed 65 percent of market for Internet DVD movie rentals).

3M admits that the Complaint alleges that 3M has a high market share in the relevant markets. (Mot. at 17; Compl. ¶ 2; Compl. ¶ 9; Compl. ¶ 15). However, 3M points to the fact that Moldex has "effectively entered the [selective-attenuation earplug] market in recent years" as evidence that Moldex "does not and cannot allege that there are significant barriers to entry." (Mot. at 17). Nonsense. "The fact that entry has

occurred does not necessarily preclude the existence of 'significant' entry barriers." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d. 1421, 1440 (9th Cir. 1995).

3M's patent lawsuit is a prime example of a significant barrier to entry into the selective-attenuation earplug market. 3M used that lawsuit, and its attendant costs, to try to keep Moldex out of the market.  The sham litigation was a barrier to entry illegally erected by 3M.  Furthermore, patents themselves are a well-recognized barrier to entry. *See In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 343 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md. 2013) (patents impose a significant barrier to entry). And, of course, governmental standards are another "main source of entry barriers." *Rebel Oil*, 51 F.3d at 1439 n.11 ("It is well known that some of the most insuperable barriers in the great race of competition are the result of government regulation.") (citation omitted). Thus, gaining purchase approval from the military constitutes a significant barrier to entry. (Compl. ¶¶ 9, 15).

**3.     The Complaint Sufficiently Alleges Exclusionary Conduct.**

3M argues that Moldex has not sufficiently alleged exclusionary conduct on the part of 3M. (Mot. at 18.)  However, as 3M notes, "patent infringement lawsuits that qualify as exclusionary conduct under Section 2 are those initiated and conducted in bad faith." (Mot. at 18). Moldex could not agree more. As shown, the Complaint sufficiently alleges sham litigation, and sham litigation is a recognized type of exclusionary conduct actionable under section 2 of the Sherman Act. *Prof'l Real Estate Investors,* 508 U.S. at 60-61. Furthermore, 3M's misleading advertising, discussed below, regarding its Combat Arms earplug is another example of 3M's predatory conduct aimed at driving Moldex

from the market. (Compl. ¶ 29). The Complaint sufficiently alleges antitrust injury, objective and subjective baselessness, a relevant market, monopoly power, and exclusionary conduct.

### 4.   The Complaint Also Sufficiently Alleges an Attempted Monopolization Claim.

3M's last argument regarding Moldex's antitrust claim is that the Complaint fails to sufficiently allege that 3M had the specific intent to monopolize, and the Complaint "lacks the factual 'heft' required by *Twombly*" in regard to showing that 3M had a dangerous probability of achieving monopoly power. (Mot. at 18-19).

At the pleading stage, courts recognize that "facts to support allegations about [a defendant's specific] intent are likely in the possession of [the defendant]," and furthermore, "anticompetitive conduct alone can satisfy the specific intent requirement if the conduct is 'clearly threatening to competition or clearly exclusionary.'" *Catch Curve*, 519 F. Supp. at 1035 (citing *Spectrum Sports, Inc.*, 506 U.S. at 459). Moldex's Complaint sufficiently alleges that 3M engaged in anticompetitive conduct by attempting to drive Moldex out of the market via sham litigation. This alone is sufficient to prove 3M's intent to monopolize. Further, the Complaint sufficiently alleges that 3M brought its patent lawsuit in bad faith, with the intent to monopolize.

The Complaint also sufficiently alleges a "dangerous probability" of achieving monopoly power. Inherent in such claims is that the monopolization is not yet complete. *See Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 785 (1946) ("The phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if

successful, accomplish monopolization….”); *see also Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 994 (5th Cir. 1983) (“The offense of attempted monopolization need not cause actual market damage, but need merely threaten to produce the type of market damage contemplated in the antitrust laws.”); *Prof’l Real Estate Investors*, 508 U.S. at 60-61 (the relevant question for sham litigation claims is whether the patentee intended to use the governmental process itself—e.g., litigation—as an anticompetitive weapon).

3M does not escape antitrust liability simply because its plan to block Moldex from the market failed. Had 3M’s plan succeeded, its main competitor would have been blocked from the market, and 3M would have obtained a monopoly. As such, Moldex's Complaint adequately pleads an attempted monopolization claim.

## II.   The Unfair Competition Law Claim Is Adequately Pled

### A.   3M's Sham Patent Litigation Violates California’s Unfair Competition Law.

3M argues that, because the Complaint fails to sufficiently allege an antitrust claim, Moldex cannot bring a claim under California's Unfair Competition Law (“UCL”) “based upon the same predicate conduct.” (Mot. at 19-20). As shown, however, the Complaint sufficiently alleges an antitrust claim. This alone satisfies the *Cel-Tech* test. *See Cel-Tech Commc’ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180-81 (1999). Thus, the Complaint sufficiently alleges a UCL claim.

Moldex need only allege one plausible ground for its UCL claim. *See Cel-Tech*, 20 Cal. 4th at 180-81. Therefore, if the Court finds that the Complaint sufficiently alleges a claim based on its allegations of anticompetitive conduct, the Court may end its inquiry

regarding the UCL claim and deny 3M's motion. Even if that were not the case, however, the UCL claim would still be sufficient, since it also alleges that 3M has engaged in misleading advertising regarding its Combat Arms earplugs.

> **B.      3M's False Advertising of the Noise Reduction Rating on 3M's Combat Arms Earplugs Also Violates California's Unfair Competition Law.**

Moldex's Complaint alleges that 3M has engaged in misleading advertising regarding the noise reduction rating ("NRR") associated with a user's ability to hear commands and other desired sound in the open position on its Combat Arms earplugs. (Compl. ¶ 29). NRRs are measurement standards called for by Environmental Protection Agency ("EPA") regulations, 40 C.F.R. § 211.201 *et seq.*, under the Noise Control Act ("NCA"). 42 U.S.C. § 4901 *et seq.* The NRR measures an earplug's attenuation of continuous noise, not impulsive noise like an explosion. 40 C.F.R. § 211.204.  3M's Combat Arms earplug has two modes: a "closed" mode that operates like a traditional earplug by blocking all sound, and an "open" mode that has a sound channel that attenuates gunfire and explosions while at the same time allowing the user to hear spoken commands and other desired nearby non-impulsive sounds.  (Compl. ¶¶ 8, 14).  3M continues to advertise that its Combat Arms earplug has a zero NRR in the open mode, thereby creating a false expectation that in open mode, 3M's earplugs do not affect the ability to hear commands, approaching vehicles or combatants. (Compl. ¶ 29). This zero NRR was achieved through 3M's noncompliance with proper testing procedures. (*Id.*). Essentially, 3M gamed its NRR calculations in order to sell more product to the military

and the general public with deceptive claims of an ability to hear without any attenuation of non–impulse sounds in the open position. (Compl. ¶¶ 9, 15).

3M asserts that the Complaint fails to sufficiently allege a UCL false advertising claim because: (1) 3M's zero NRR advertising is not misleading; (2) 3M is entitled to "safe harbor" because it has complied with federal regulations; and, (3) Moldex's false advertising claim is time-barred. (Mot. at 23-30).  All of these arguments are meritless.

### 1.      3M's NRR Advertising Is Highly Misleading to Consumers and Is Anticompetitive.

The UCL has three independent prongs, and a competitor violates the UCL if its conduct is (1) unlawful, (2) unfair, *or* (3) fraudulent. *In re Tobacco II Cases*, 46 Cal. 4th 298, 311 (2009) (citation omitted); Cal. Bus. & Prof. Code § 17200 *et seq.*; Cal. Bus. & Prof. Code § 17500 *et seq.*.  California's UCL has a broad scope that "sweeps within its scope acts and practices not specifically proscribed by any other law," and furthermore, any violation of the false advertising law, § 17500 *et seq.*, also violates the UCL. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949-50 (2002).

In prohibiting unlawful business practices, the UCL borrows violations of other laws and treats them as independently actionable. *Cel-Tech*, 20 Cal. 4th at 180 (citations omitted). A practice is deemed unfair when the "harm to the victim outweighs its benefits," even if not proscribed by some other law. *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 332 (1998); *see also Cel-Tech*, 20 Cal. 4th at 180. To allege fraudulent false advertising under the UCL, "it is necessary only to show that 'members of the public are

likely to be deceived'; [a]ctual deception or confusion caused by misleading statements is not required." *In re Tobacco II Cases*, 46 Cal. 4th at 312 (citations omitted).

3M's highly misleading and anticompetitive advertising of a zero NRR on its Combat Arms earplug constitutes an unlawful, unfair, and fraudulent business practice. (Compl. ¶ 29, 39). In using improper NRR testing procedures (Compl. ¶ 29), 3M has violated the NCA by failing to comply with the EPA regulations governing the measurement of NRR, and therefore, committed an unlawful business practice. Further, regardless of whether 3M complied with NCA labeling regulations, 3M's false advertising constitutes an unfair practice because 3M is misleading soldiers into believing that Combat Arms earplugs have no impeding effect on a soldier's ability to hear commands and enemy combatants, thereby putting soldiers' lives at risk. Additionally, 3M's conduct constitutes a fraudulent business practice, because members of the public are likely to be deceived into believing that their hearing will be completely unimpeded when they use Combat Arms earplugs in the open mode.

### 2. 3M Is Not Entitled to Safe Harbor.

3M next argues that it is entitled to safe harbor because it supposedly complied with the NCA, but this is wrong. (Mot. at 27). 3M is not entitled to safe harbor "merely because some other statute on the subject does not, itself, … prohibit the challenged conduct." *Cel-Tech*, 20 Cal. 4th at 182-83. The Complaint sufficiently alleges that 3M failed to follow proper testing procedures in obtaining the zero NRR (Compl. ¶ 29), which is not permitted under the NCA. *See* 40 C.F.R. § 211.206-1 ("The NRR must be determined according to the 'Method for the Measurement of Real–Ear Protection of

Hearing Protectors and Physical Attenuation of Earmuffs.'"). Thus, 3M is not entitled to safe harbor.

Furthermore, even if 3M did comply with NCA labeling regulations, 3M is still not entitled to safe harbor. 3M essentially argues that the NCA and its associated regulations preempt UCL claims challenging labels regulated by the NCA. (Mot. at 27). However, the language of the NCA expressly rejects this argument. *See* 42 U.S.C. § 4911(e) ("Nothing in this section shall restrict any right which any person … may have under any statute or common law to seek enforcement of any noise control requirement or to seek any other relief.").

A "cornerstone of [] pre-emption jurisprudence" is that there is a presumption against preemption, particularly when "Congress has legislated ... in a field which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation omitted). This presumption cannot be overcome absent "the clear and manifest purpose of Congress." *Id*. (citation omitted). The NCA expressly acknowledges that it regulates an area of traditional state concern. 42 U.S.C. § 4901(a)(3) ("[P]rimary responsibility for control of noise rests with State and local governments…."). Thus, the presumption against preemption applies to the present case, and 3M has failed to overcome this presumption.

Moreover, on facts similar to the present case, the Supreme Court in *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2231 (2014), utilized an "instructive" preemption analysis to determine the viability of a Lanham Act unfair competition claim. The Supreme Court held that Pom's Lanham Act claim could challenge food and

29

beverage labeling regulated by the Food Drug and Cosmetics Act ("FDCA"). *Id.* Pom alleged that Coca-Cola's fruit juice labeling was misleading and brought an unfair competition claim under the Lanham Act, a federal statute. *Id.* at 2233. Coca-Cola argued that it was not liable under the Lanham Act because Coca-Cola had complied with the FDCA's labeling requirements. *Id.* at 2235-36. Although noting that "this is not a pre-emption case," the Court used "[p]re-emption principles" to guide its analysis. *Id.* at 2236. The Court flatly rejected Coca-Cola's argument that it was entitled to safe harbor from Lanham Act claims because it had complied with FDCA labeling regulations. *Id.* at 2241-42. First, neither statute at issue expressly prohibited Lanham Act claims from challenging labels regulated by the FDCA. *Id.* at 2237. Second, the two statutes were complementary, as the statutes had differing purposes. *Id.* at 2238-39. The Lanham Act "protects commercial interests against unfair competition, while the FDCA protects public health and safety." *Id.* at 2238. Thus, the Court held that Coca-Cola could still be held liable for violating the Lanham Act, even if it had complied with the FDCA's labeling requirements. *Id.* at 2241-42.

Applying the same analysis to the present case, 3M may still be held liable under the UCL in spite of its alleged compliance with the NCA labeling regulations. The NCA expressly provides that plaintiffs may seek "any other relief" regarding noise protection labeling. 42 U.S.C. § 4911(e). Furthermore, the UCL does not expressly prohibit challenges to labels regulated by the NCA. Cal. Bus. & Prof. Code § 17200 *et seq.*

Additionally, the purposes underlying the UCL and the NCA are completely different. The NCA was created to protect citizens from loud noises. 42 U.S.C. § 4901

(explaining that "inadequately controlled noise presents a growing danger to the health and welfare of the Nation's population," and that "it is the purpose of this chapter … to provide information to the public respecting the … noise reduction characteristics of [products distributed in commerce]"). As evidenced by 3M's explanation of the NRR measurement procedures (Mot. at 24-26), NCA labeling requirements were designed to prevent manufacturers of hearing protection products from *overstating* the noise reduction capabilities of their products, where the products' function is to reduce the level of harmful decibel sounds entering the wearer's ear. Here, 3M's misleading zero NRR advertising *understates* Combat Arms' noise reduction effect regarding the open position of 3M's plug, for which the wearer desires the maximum sound level to enter the ear—so that commands and approaching vehicles or combatants can be heard. If 3M's argument were accepted, 3M could advertise a zero NRR on an earplug that actually reduced a soldier's ability to hear commands by 33 decibels- (virtually completely blocking all sound) , as this would be allowed under the NCA. (Mot. at 24-26). 3M cannot use its alleged compliance with NCA labeling requirements to shield itself from UCL liability.

The UCL and the NCA are complementary because, while the NCA prevents hearing protection manufacturers from overstating NRRs for hearing protection intended to reduce sound levels, the UCL allows competitors to hold such manufacturers liable for misleadingly understating NRRs for hearing protectors intended to maximize a soldier's ability to hear commands and other essential sounds to protect his or her life.

### 3. 3M's False Advertising Constitutes a Continuing Wrong, and Moldex's False Advertising Claim Is Not Time-Barred.

3M's final UCL argument, that Moldex's false advertising claim is time-barred because it began accruing more than three years ago, quotes *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185 (2013), for the proposition that the limitations period on a false advertising claim "runs from the moment a claim accrues." (Mot. at 29). However, the relevant holding in *Aryeh* is that all UCL claims are subject to the common-law doctrine of continuous accrual, in that each act of unlawful, unfair, or fraudulent conduct "trigger[s] its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to those within the applicable limitations period." *Id.* at 1192. The theory of continuous accrual prevents "parties engaged in long-standing misfeasance" from "obtain[ing] immunity in perpetuity from suit even for recent and ongoing misfeasance. " *Id.* at 1198. The continuous accrual doctrine is applicable to false advertising claims. *See, e.g.*, *Allen v. Similasan Corp.*, 12 CV 0376-BTM-WMC, 2013 WL 5436648, at *4-6 (S.D. Cal. Sept. 27, 2013) (continuous accrual doctrine saved some of plaintiffs' purchases from being time-barred, "as the Plaintiffs made discrete purchases of different [homeopathic] products over many years" based on allegedly unsubstantiated claims made on the products' packaging).

Even after notice from Moldex, 3M brazenly continues to mislead consumers and our military, and divert sales away from Moldex, by marketing 3M's Combat Arms earplug as having a zero NRR in open position. (Compl. ¶ 29). As such, Moldex, the military, and consumers are continually injured by 3M's misrepresentations. On its UCL

claim, Moldex does not seek damages for past wrongs; instead, Moldex only seeks prospective injunctive relief. (Compl. ¶ 29, 39-41). Thus, Moldex's UCL claim is not time-barred.

## III.    The Complaint Adequately Alleges a Claim for Malicious Prosecution.

3M argues that the Court should dismiss Moldex's malicious prosecution claim for the same reasons that 3M's patent lawsuit is allegedly entitled to immunity under the *Noerr-Pennington* doctrine. (Mot. at 20-21). This is wrong. The Complaint alleges numerous facts that more than sufficiently support an inference that 3M's patent lawsuit was objectively baseless and that 3M lacked probable cause. Furthermore, the Complaint sufficiently alleges that Moldex did in fact challenge the validity of the '157 patent and the infringement of the '693 patent, but that 3M prevented summary judgment by the covenant not to sue gambit. Thus, the Complaint adequately alleges a claim for malicious prosecution.

## IV.    Minnesota's Anti-SLAPP Statute Does Not Defeat Moldex's Claims Against 3M.

### A.    The Relevant Anti-SLAPP Statute Is Minnesota's, Not California's.

This Court should apply Minnesota law to decide 3M's motion state law claims. 3M has not shown otherwise. 3M makes only a glancing, equivocal reference to a potential choice of law issue. (Mot. at 22, n.7). 3M has not explained, however, whether or how there is any actual conflict in outcome under Minnesota's or California's Anti-SLAPP laws. *Id.* Federal courts apply the choice of law rules of the forum state to state law claims taken under supplemental jurisdiction. *See Eggleton v. Plasser & Theurer*

*Exp. VonBahnbaumaschinen Gesellschaft, MBH*, 495 F.3d 582, 585 (8th Cir. 2007).

*Christian v. Birch*, 763 N.W.2d 50, 56 (Minn. Ct. App. 2009) (describing Minnesota's

multi-step analysis). The Court should not forego the forum state's law with respect to

Moldex's state law claims,.[8] As the state where the proceeding complained of in

Moldex's malicious prosecution claims took place, Minnesota has an interest in

protecting the integrity of its traditional litigation processes. *See Restatement (Second) of*

*Conflict of Law*, Section 155(for malicious prosecution, favoring local law of state where

underlying proceeding complained of occurred); *see also Competitive Technologies, et al*.

*v. Fujitsu Ltd., et al.*, 286 F. Supp. 2d 1118, 1123 (N.D. Cal. 2003).

### B.    Minn. Stat. Section 554 Does Not Apply to Moldex's Federal Antitrust Claims or State Unfair Competition Claims.

State anti-SLAPP statutes do not apply to federal causes of action in federal court.

*See, e.g., Bulletin Displays LLC v. Regency Outdoor Advertising, Inc.*, 448 F. Supp. 2d

1172, 1181-1182 (C.D. Cal. 2006). 3M made no contention or showing that Minnesota's

anti-SLAPP statute applies to the federal antitrust claims (Count I). Likewise, by the

plain statutory language, only judicial claims "seeking damages for an alleged injury" are

covered by the Anti-SLAPP statute. Minn. Stat. §554.01 subd. 3. Moldex's claim, for

injunctive relief only, under the California UCL (Count III) is expressly excepted from

the relevant definition. *Id.*(" 'Judicial claim' does not include a claim solely for injunctive

---

[8] Minnesota conflicts of law analysis requires application of a multi-factor test to resolve actual, outcome-determinative conflicts. *Jepson v. General Casualty Co. of Wisconsin*, 513 N.W.2d 467, 470 (Minn. 1994).

relief.").

**C.    3M's Recitation of the Minnesota SLAPP Statute Is Inaccurate.**

3M wrongly argues that Moldex must produce evidence showing by "clear and convincing evidence" that the acts of the moving party (i.e., 3M) were "not genuinely aimed at procuring favorable government action, constituted a tort or violated another's constitutional right." (Mot. at 22). 3M's argument gets it backwards (and basically skips the predicate step). It is 3M, as movant, who bears the burden of initially showing that Minnesota's anti-SLAPP statute applies to Moldex's claims in this lawsuit.

In *Middle-Snake-Tamarac Rivers Watershed Dist. v. Stengrim*, 784 N.W.2d 834 (Minn. 2010) ("*Stengrim*"),the Minnesota Supreme Court established a two-step process to determine whether and how the anti-SLAPP procedure should be applied.

Under the Minnesota approach outlined in *Stengrim*, the *moving party* must, as a preliminary matter, meet the burden of showing that the circumstances which bring the case within the purview of SLAPP protection exists. Only then would the burden shift to Moldex as the responding party to rebut the claim of immunity.[9]3M's required threshold showing is not just a mere assertion (or assumption) that any later-challenged lawsuit constitutes "public participation." Instead, the Court must examine the character of the underlying lawsuit and its relationship to some public controversy or government action.

_____

[9] In *Leiendecker*, the recent Minnesota Supreme Court decision cited by 3M, the court assumed without deciding (as had the court of appeals) that the moving party had made the sufficient threshold showing that the underlying conduct or claim "materially relates to an act of the moving party that involves public participation." Slip op. at *9.

894.23795/6146631.1

102122706v1

As shown next, 3M fails to do so.

**D.    3M's Motion Fails to Establish That 3M's Abandoned Patent Lawsuit Qualifies as "Public Participation."**

In *Stengrim*, the Minnesota Supreme Court interpreted Section 554.02 in a common sense way consistent with the plain language. Without the "public participation" restriction, "all claims would be subject to the irregular procedural process outlined in Minn. Stat. §§554.01-.05." *Stengrim*, 784 N.W. 2d at 841. This would be an absurd result not intended by the legislature.[10] The *Stengrim* court stated 3M's initial burden, as movant, this way:

> Stated another way, the defendant or moving party, must make a threshold showing that the acts that are "materially" related to the responding party's claim are themselves public participation, i.e. "speech or *lawful* conduct that is *genuinely* aimed in whole or in part at procuring favorable government action."

*Id*. (emphasis added; citations omitted). 3M, however, basically skips this first step of the analysis and asks the Court to assume along with it that: (i) the filing of any federal patent lawsuit per se constitutes "public participation" under the Anti-SLAPP statute; and (ii) the filing of 3M's own patent case was indisputably not a sham. But Moldex has fully alleged that 3M's patent lawsuit was neither "lawful conduct" nor "genuine." The violation of the antitrust laws and sham nature of the lawsuit are not properly protected by anti-SLAPP laws as "public participation."

---

[10]Minnesota passed this statute to "protect[ ]citizens and organizations from civil lawsuits for exercising their rights of public participation in government." *See* Act of May 5, 1994, ch. 566, 1994 Minn. Laws 895.

The Court in *Stengrim* explained the origins and purpose of the anti-SLAPP statute and chronicled the kinds of classic situations where the statute had been applied to "public participation": land use and development disputes,[11] conduct at a city council meeting,[12] letter writing campaigns from citizens groups to city officials,[13] and internet speech regarding the placement of a proposed sex offender treatment facility.[14]

3M asks this Court to assume that 3M's patent lawsuit "indisputably" constitutes an act to petition the government that falls within the Anti-SLAPP statute. (Mot. at 21). Saying something is "indisputable" does not make it so. 3M cites no cases decided under Minn. Stat. §554 that applied to the assertion of patent claims. Broadly invoking *Noerr-Pennington*, 3M wants the Court to assume that any assertion of rights in a suit falls within the "public participation" shield of the Anti-SLAPP laws. *But see Stengrim*, 784 N.W.2d at 840 n.7 (rejecting, as did the court of appeals, reliance on the *Noerr-Pennington* doctrine as blanket protection under the anti-SLAPP statute for those seeking right of access to the courts). Because the Court has nothing except 3M's "indisputable" assumption, 3M's motion should be denied without even addressing the second step of the *Stengrim* analysis.

---

[11]*Stengrim*, 784 N.W. 2d at 842 (addressing disputes between real estate developer and Watershed District over land use).

[12]*Nygard v. Walsh*, 2014 WL 349761 (Minn. Ct. App. 2014), at *1(defamation alleged for statements made at a public comment portion of city council meeting).

[13]*Marchant Inv. & Mgmt. Co. v. St. Anthony W. Neighborhood Org.*, 694 N.W. 2d 92, 94 (Minn. Ct. App. 2005) (defamation alleged against neighboring residents in the course of opposing building permit by land developer).

[14]*Nexus v. Swift*, 785 N.W. 2d 771 (Minn. Ct. App. 2010) (posting by neighbor that sex offender facility provider was "getting away with murder").

Moreover, challenging 3M's abandoned patent lawsuit puts no chilling effect on 3M's access to the courts and does not justify invoking the irregular procedural process under Minnesota's Anti-SLAPP law. 3M itself voluntarily withdrew its patent claims on the eve of the hearing on Moldex's motion for summary judgment, gave Moldex broad covenants not to sue, and folded up 3M's enforcement efforts when Moldex exposed 3M's flaws by diligent defense. (Conneely Decl. Pars. 11-14; Compl. ¶¶ 23-28). 3M suggested (after the fact) that its decisions were commercially motivated—not because of any limitations on "public participation." As the party who voluntarily granted Moldex unrestricted covenants and then walked away from its challenged patent rights, 3M should not now be shielded.[15]

In *Stengrim*, the Minnesota Supreme Court rejected the applicability of the anti-SLAPP statute for analogous reasons:

> Preexisting legal relationships, such as those based on a settlement agreement where a party waives certain rights, may legitimately limit a party's public participation. It would be illogical to read sections 554.01-.05 as providing presumptive immunity to actions that a moving party may have contractually agreed to forgo or limit.

784 N.W.2d at 842; *see also Enbridge Energy, L.P. v. Drydal*, 2011 WL 5026348 (Minn. Ct. App. 2011) (non-precedential).

In this case, 3M granted to Moldex a royalty-free covenant not to sue and then

---

[15]Being challenged by Moldex for an instance of baseless enforcement of two of its many patents does not prevent 3M from routinely filing patent cases in this District, and 3M does not suggest otherwise. The Court can take judicial notice from its ECF system that 3M is a frequent and continuing patent enforcer in the District of Minnesota. *See* Conneely Decl. at Pars. 17-18, Exs. 16,17.

without any settlement or payment abandoned 3M's patent lawsuit (which was then

dismissed over Moldex's objection). Thus, the Court cannot simply assume, as 3M would

have it, that any and all past lawsuits are "genuine" and "lawful" and qualify as "public

participation." 3M has not met its obligations, as movant, to make a showing of "public

participation" under Minnesota's anti-SLAPP protections.

### E.   Although Clear and Convincing Evidence Supports Moldex's State Law Claims, Application of That Draconian Pre-discovery Standard Would Render Minnesota's Anti-SLAPP Statute Unconstitutional or Preempted by Federal Law.

Even if 3M had made the "public participation" showing, application of the "clear

and convincing" proof requirement in Minnesota's anti-SLAPP statute here would violate

the U.S. and Minnesota constitutional right to a jury trial and to due process and would

impermissibly conflict with federal law. Regardless, Moldex has adduced at this pleading

stage clear and convincing evidence (and deserves the opportunity to discover more) to

support its state law malicious prosecution claim based on 3M's objectively baseless

patent litigation.

### 1.   Minnesota's Anti-SLAPP Statute Violates the Minnesota And U.S. Constitutions[16]

As the Minnesota Supreme Court suggested might be the case in *Leiendecker*,

application of the draconian burden of Minnesota's anti-SLAPP statute violates the right

---

[16] The Court can and should deny 3M's motion based on the failure of the "public participation" prong. If the Court addresses the second prong, however, Moldex incorporates and reserves for appeal the argument that Minnesota's anti-SLAPP provisions violate the Minnesota and United States Constitutions. *See Leiendecker*, Slip Op. at 14-15; *Stengrim*, 784 N.W.2d at 842, n.9.

894.23795/6146631.1

102122706v1

to a jury trial and to due process of the Minnesota constitution. Slip. op. at 14-15.[17]

*Leiendecker* did not grant review or receive briefing on the constitutional issue, however, because the parties opposing the motion to dismiss did not present it. *Id.* Moldex expressly makes those arguments here.

When asserted in federal court, Minnesota's anti-SLAPP statute violates the Constitutional right to a jury trial and to due process and because the statute conflicts with the Federal Rules of Civil Procedure. In multiple well-reasoned decisions, federal courts have held that the dismissal provisions in the relevant anti-SLAPP statute are irreconcilable with the Federal Rules and have adjudicated dispositive motions based on Rules 12 and 56, not the anti-SLAPP statutes. *Intercon Solutions, Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1041-48 (N.D. Ill. 2013); *3M Co. v. Boulter*, No. 11-cv-1527 (RLW), 2012 WL 5245458, at *2 (D.D.C. Oct. 24, 2012); *3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012)[18]; *South Middlesex Opportunity Council, Inc. v. Framingham*, 07 Civ. 12018 (DPW), 2008 WL 4595369, at *11 (D. Mass Sep. 30, 2008); *see also The Royalty Network, Inc. v. Harris*, No. 13-12460, slip op. at 16-20 (11th Cir. 7-10-2014) (verification requirement of Georgia's anti-SLAPP statute impermissibly conflicted with

---

[17] Constitutional infirmity of Minn. Stat. §554 was also noted, but not addressed, in *Stengrim*. 784 N.W.2d at 842, n. 9.

[18] In *3M Co. v. Boulter*, 3M faced a motion to dismiss brought pursuant to a state anti-SLAPP statute and opposed the motion (successfully) by contending that the anti-SLAPP statute did "not apply in a federal court sitting in diversity." *3M Co. v. Boulter*, 842 F. Supp. 2d at 92-93. 3M also argued in the alternative that it should at least be permitted discovery: "3M contends that, if this Court finds that the Anti–SLAPP Act is applicable here, 3M is at the very least entitled to the same amount of discovery it would otherwise be granted under Rule 56(d)." *Id.* at 93.

Federal Rule of Civil Procedure 11).[19]

As one federal court put it, "Rule 56 simply trumps any state Anti–SLAPP law that requires a trial judge to resolve disputed factual issues and decide a case on the merits prior to trial." *3M Co. v. Boulter*, No. 11-cv-1527 (RLW), 2012 WL 5245458, at *2 (D.D.C. Oct. 24, 2012). The anti-SLAPP statute's dismissal procedures are "alien to the federal courts" and in conflict with the Supreme Court's explanation in *Twombly* that, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the fact finder." *3M Co. v. Boulter*, 290 F.R.D. 5, 11 (D.D.C. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 563 n.8 (2007)).

The reasoning of these courts also suggests that anti-SLAPP statutes interfere with the right to a jury trial in the United States constitution as well as the Supremacy Clause. *See, e.g.*, *3M Co. v. Boulter*, 2012 WL 5245458, at * 1 ("The Supreme Court has made it

_____

[19] A few United States Courts of Appeals have ruled that state anti-SLAPP procedures apply in federal courts. *See Godin v. Schencks*, 629 F.3d 79, 88 (1st Cir. 2010) (holding that Maine's Anti–SLAPP statute applied in federal diversity cases); *United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 972-73 (9th Cir. 1999) (holding that California's anti-SLAPP statute did not conflict with the Federal Rules of Civil Procedure); *see also Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164 (5th Cir. 2009) (adopting the reasoning of the Ninth Circuit in *Newsham*). Subsequent cases in the Ninth Circuit suggest that the Ninth Circuit would now reach a different outcome. *See Intercon Solutions*, 969 F. Supp. 2d at 1048-50 (discussing *Lockheed* and subsequent cases). California federal courts treat a motion to dismiss under the California Anti-SLAPP statute "as a motion for summary judgment, and discovery must be developed sufficiently to permit summary judgment under Rule 56." *Bulletin Displays LLC,* 448 F. Supp. 2d at 1180(internal quotations omitted).

quite clear that Rule 56 sets the outer boundary for dismissing claims on the merits based upon a pretrial evaluation of the evidence; to go further infringes upon the Seventh Amendment right to a jury trial.") (citing *Sartor v. Arkansas Natural Gas Corp*., 321 U.S. 620, 627–28 (1944)).

Neither the Eighth Circuit nor the District of Minnesota has addressed whether Minnesota's (or any other state's) anti-SLAPP procedures conflict with federal law. There is ample authority to conclude that it does.

One way to save the Minnesota Anti-SLAPP statute from the identified—but not resolved—constitutional infirmity would be to review 3M's motion to dismiss under traditional Rule 12 and Rule 56 standards.[20] This was the exact approach taken in Minnesota prior to the recent *Leiendecker* opinion. *See Marchant*, 694 N.W.2d at 95; *Nexus*, 785 N.W. 2d at 781.

### 2. Moldex Has Clear and Convincing Evidence to Support Its State Law Claims.

Moldex's malicious prosecution claim is based on 3M's prior abandoned patent lawsuit, the evidence of the objectively baseless nature of which is shown in Moldex's motion for summary judgment in that suit as well as 3M's abandonment of the suit immediately before Moldex's dispositive motions could be heard and by 3M's pretextual assertion that it did so because Moldex was too small a competitor to try to step on.

---

[20] The Court should treat 3M's motion to dismiss as a motion for summary judgment to be determined only after full discovery. *See Bulletin Displays LLC,* 448 F. Supp. 2d 1180.

894.23795/6146631.1

102122706v1

Accordingly, Moldex references that dispositive motion—and its supporting evidence—to show that Moldex's current claims are supported by clear and convincing evidence. *See* Conneely Decl. Pars. 9, 12; Exs. 6-8, 11-12 .[21] Additional discovery Moldex has outlined will also show clear and convincing evidence to support Moldex's malicious prosecution claim. Conneely Decl. par. 19. This discovery is largely co-extensive and overlapping with Moldex's other causes of action.[22]

## Conclusion

3M's motion to dismiss should be denied. Moldex has sufficiently pleaded all required elements of its antitrust, UCL, and malicious prosecution claims. If the Court finds to the contrary, Moldex had filed separately a proposed amended complaint setting forth additional allegations.

Date: July 30, 2014               By: s/Kevin D. Conneely
                                      Kevin D. Conneely (MN #192703)
                                      Katherine A. Moerke (MN #312277)
                                      STINSON LEONARD STREET LLP
                                      150 South Fifth Street , Suite 2300
                                      Minneapolis, MN 55402
                                      Telephone: (612) 335-1500

---

[21]The Court can take notice of Moldex's summary judgment motion and supporting evidence that were filed in redacted form in 3M's patent lawsuit. *See* Fed. R. Evid. 201; *United States v. Eagleboy*, 200 F.3d 1137 (8th Cir. 1999). Unredacted copies of those papers are also submitted, under seal, with Moldex's opposition. Conneely Decl., Pars. 9, 12; Exhs. 6-8, 11, 12.)

[22] Minnesota's anti-SLAPP statute permits a court to order "specified and limited discovery" on a showing of good cause. Minn. Stat. §554.02, subd. 2(1). Here, if the Court concluded that Moldex must make a further showing of clear and convincing evidence, Moldex seeks the fulsome discovery allowed under federal law (and argued for by 3M in the *Boulter* case) to make that showing.

Facsimile: (612) 335-1657
kevin.conneely@stinsonleonard.com
katie.moerke@stinsonleonard.com

AND

Harold A. Barza
(California Bar No. 80888) (admitted *pro hac vice*)
halbarza@quinnemanuel. com
Matthew Hosen (California Bar No. 291631)
(admitted *pro hac vice*)
matthosen@quinnemanuel.com
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3211

**ATTORNEYS FOR PLAINTIFF
MOLDEX METRIC, INC.**