UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Moldex Metric, Inc.,                                        Civil No. 14-1821 (JNE/FLN)

                Plaintiff,
v.                                                          **ORDER**

3M Company et al.,

                Defendants.

_____

Kevin Conneely, Katherine Moerke, and Valerie Roddy for Plaintiff.
Eileen Hunter and Chad Drown for Defendants.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on November 30, 2015 on Plaintiff Moldex Metric, Inc.'s ("Moldex") second motion to amend its Complaint (ECF No. 141). For the reasons set forth below, the motion is **GRANTED in part and DENIED in part**.

## I. FINDINGS OF FACT

The Court incorporates its findings of fact from its previous orders. *See* ECF Nos. 89, 124. Moldex's first motion to amend its Complaint to add a claim for punitive damages was denied in an Order dated September 5, 2015. *See* Order, ECF No. 89. Moldex has additionally been ordered to turn over discovery and make specified current and former employees with information related to earmuff production development available for deposition. This came after Moldex declined Defendant 3M Company's ("3M") request that it amend its Complaint to remove earmuffs as part of the relevant product market. *See* Order, ECF No. 124.

Following the scheduled deadline to amend pleadings, Moldex received "The Flange Report" from 3M during the course of discovery. Hosen Decl. Ex. 5, ECF No. 144. The Flange Report outlined the testing procedures used by 3M for the earplug product at issue. Moldex then deposed three individuals in October on the findings in the report and 3M's knowledge at the time of the

testing. *Id.*, Exs. 5, 7, 10.

Moldex now requests leave to (1) add a claim for punitive damages, (2) remove earmuffs from paragraph 12 of the Complaint as defining the relevant product market, and (3) allege further facts supporting its unfair competition claim. Mem in Supp. of Mot. to Amend Pleadings 2–4, ECF No. 141. Specifically, Moldex seeks to add new paragraphs 30–38 which allege:

30. 3M uses misleading NRRs for its hearing protection products, based on improperly skewed and methodologically unsound self-testing performed by Combat Arms' original designer and manufacturer, Aearo Technologies Inc. ("Aearo"). Acquiring Aearo and the Combat Arms brand in 2008, 3M has knowingly continued to use materially misleading NRRs based on Aearo's inaccurate testing, including to market Combat Arms to the U.S. military and others.

31. Specifically, 3M represents that its dual-ended version of the Combat Arms has a "0" NRR in the open or unblocked position (i.e. when the yellow end is inserted in the wearer's ear), this suggesting that the open earplug will in no way impair the sounds one hears from fellow soldiers or combatants in the field. 3M represents that its dual-ended version of the Combat Arms has a "22" NRR in the closed or blocked position (i.e. when the olive end is inserted into the wearer's ear). Both the NRRs are based on improperly manipulated testing procedures.

32. Before it could be sold in the United States, the dual-ended Combat Arms earplug's NRR had to be determined and labeled in accordance with American National Standards Institute standard S3.19-1974 ("ANSI S3.19-1974"), as required by the Environmental Protection Agency ("EPA") regulations, 40 C.F.R. § 211.201 *et seq.*, under the Noise Control Act ("NCA"), 42 U.S.C. § 4901 *et seq.*

33. Rather than outsource the testing to an independent lab, in or around January 2000, Aearo personnel at Aearo's EARCAL laboratory in Indianapolis, Indiana commenced NRR testing on each end of the dual-ended Combat Arms earplug. First, Aearo personnel selected ten test subjects. When a test subject was called in to be tested, Aearo personnel tested, in no particular order: (1) the subject's hearing without an earplug inserted; (2) the subject's hearing with the open (yellow) end of the dual-ended Combat Arms earplug inserted; and (3) the subject's hearing with the closed (olive) end of the earplug inserted. Aearo personnel carefully monitored the noise attenuation results of each subject as each test is performed. As a result, they could stop the test if they did not get the NRR results they wanted. After eight of the ten test subjects had been tested on both the open and closed ends of the earplug, Aearo personnel decided not to test the last two subjects' hearing with the closed end of the plug inserted because the results for the first eight subjects revealed a NRR of 10.9, which is far below the "22" NRR that Aearo desired for the closed end of the

plug. However, Aearo personnel liked the low NRRs they were getting from the same test subjects on the open end of the plug inserted and obtained -2 NRR. Aearo decided to report the -2 NRR as a "0" NRR, which Aearo and 3M have displayed on the packing of the dual-ended Combat Arms earplugs, and related marketing materials, for the last 10 years.

34. During the testing and after prematurely terminating testing of the closed end of the earplug in or around January 2000, Aearo personnel immediately investigated the cause of the closed end's unacceptably low NRR rating and discovered that, because the stem of the closed end of the earplug was so short, it was difficult to insert the plug deeply into the subject's ear canals and obtain a proper fit, as required by ANSI S3.19-1974 Section 3.2.3. Furthermore, Aearo personnel discovered that when the olive, closed end of the earplug was inserted into the subject's ear according to standard fitting instructions, the basal edge of the third flange of the yellow, open end of the earplug sometimes pressed against the test subject's ear canal and folded backwards. When the inward pressure on the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the test subject.

35. Aearo personnel then determined that in order for a test subject to obtain proper plug insertion on the olive, closed end of the earplug, the yellow flanges on the open end of the plug had to be folded back prior to the insertion of the olive, closed end of the plug into the subject's ear. Thus, Aearo decided to retest the closed end of the earplug starting in February 2000 using different fitting instructions. During this retest of the Combat Arms' closed end, Aearo personnel folded back the yellow flanges on the open end of the earplug (essentially elongating the too-short stem) to allow the experimenter to insert the closed end of the plug deeply into the subject's ear in order to obtain a proper fit. Furthermore, as the yellow flanges were folded back during this retest, the basal edge of the third flange of the yellow, open position end no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. As a result, the closed end of the dual-ended Combat Arms earplug achieved a "22" NRR on this retest. Aearo used, and 3M continues to use, the results of this retest to sell dual-ended Combat Arms earplugs with a "22" NRR in the closed position. However, in the instructions included in the packaging of the dual-ended Combat Arms earplug, 3M does not instruct wearers to fold back the flanges before inserting the plug into the ear. Instead, 3M improperly instructs wearers to use standard fitting instructions when inserting the earplug. By failing to instruct wearers of the dual-ended Combat Arms earplug to fold back the flanges on the open end of the plug before inserting the closed end of the plug into their ears (which is necessary to achieve the "22" NRR), 3M continues to misleadingly overstate the amount of hearing protection provided by the closed end of the plug. 3M's marketing and selling of such earplugs with a labeled NRR of "22" thereby misleads soldiers, putting them at risk of suffering serious hearing impairment on the battlefield.

36. Due to the symmetrical structure of the dual-ended Combat Arms earplug, the design defects noted above that affect the wearer's fitting on the closed end of the earplug also impact the wearer's fitting of the open end of the earplug. Indeed, it is apparent from the NRR test data on the open end of the earplug that multiple test subjects were not properly fitted with the open end of the dual-ended Combat Arms earplug, as required by ANSI S3.19-1974 Section 3.2.3., and did not achieve a proper "seal" between the ear canal and the earplug, thereby allowing some noise to bypass the earplug filter and go directly into the ear canal. As a result, certain test subjects had large standard deviations across trials on the open end test, which artificially drove down the NRR to -2 in the open position. Notwithstanding these facially unreliable results, Aearo did not go back and retest the open end of the earplug using the modified fitting instructions, i.e. folding back the flanges on the olive, closed end of the earplug prior to inserting the yellow, open end into the ear, because ensuring a proper fit in the test subjects would have increased the NRR over the "0" NRR Aearo had previously obtained.

37. The reasoning behind Aearo's inaction is clear: Aearo wanted a very low NRR on the open end of its Combat Arms earplug (like the "0" NRR it previously obtained) so that the U.S. Military would be more likely to buy it, and if the open end of the plug were fitted securely into the test subjects' ears using the modified insertion instructions, the NRR would have been higher on the open end of the earplug. Neverthless, Aearo and 3M have continued to sell the dual-ended Combat Arms earplug with "0" NRR in the open position and with standard fitting instructions, thereby putting soldiers at risk of serious hearing loss because the fit of the earplug can loosen, often imperceptibly to the wearer, thereby breaking the seal between the ear canal and the earplug and allowing dangerous impulse noise to bypass the filter on the open end.

38. Thus, Aearo unlawfully manipulated testing procedures and fitting instructions to obtain NRRs it wanted on both ends of the dual-ended Combat Arms earplug and 3M has continued to use these inaccruate NRRs to market these earplugs to the United States military. The closed end only obtains a "22" NRR if inserted using non-standard insertion instructions that 3M does not disclose to wearers. This grossly overstates the noise protection offered by this end of the plug in violation of ANSI S3.19-1974, EPA Regulations, 40 C.F.R. § 211.201 *et seq*., and the Noise Control Act, 42 U.S.C. § 4901 *et seq*. Meanwhile, the open end's "0" NRR is based on facially unreliable test data derived from tests in which the earplugs were not fitted properly in the subjects' ears.

ECF No. 144, Ex. 1 at 12–16.

## II. STANDARD OF REVIEW

Rule 15(a)(2) Federal Rules of Civil Procedure states that a party may only amend his

complaint with leave of the court. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Although courts liberally construe this rule, there is no absolute right to amend. *See Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647, 650–51 (8th Cir. 1996). However, only limited circumstances justify a district court's refusal to grant leave to amend pleadings, such as "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987). A proposed amendment is futile if it could not survive a Rule 12 motion to dismiss. *See In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007).

When a party seeks to amend the complaint after the deadline provided in a court's pretrial scheduling order, Federal Rule of Civil Procedure 16 applies. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008). Rule 16(b) states that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Therefore, "Rule 16(b)'s good-cause standard governs when a party seeks leave to amend a pleading outside of the time period established by a scheduling order, not the more liberal standard of Rule 15(a)." *Sherman*, 532 F.3d at 716; *see also In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437–38 (8th Cir. 1999) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."). Similarly, Local Rule 16.3 states that "[a] party that moves to modify a scheduling order must . . . establish good cause for the proposed modification."

### III. CONCLUSIONS OF LAW

**A.     Claim for Punitive Damages**

In denying Moldex's previous motion to add a claim for punitive damages, the Court held that Moldex had not met its burden to show by clear and convincing evidence that 3M acted with

5

deliberate disregard for the rights and safety of others pursuant to Minn. Stat. § 549.20. *See* ECF No. 89 at 3. To bolster its claim, Moldex presents a plethora of evidence that was purportedly unavailable at the first hearing in the form of internal 3M emails and deposition testimony that 3M engaged in a deliberate scheme referred to as the "Three-Legged Stool" campaign. ECF No. 144, Exs. 14–16, 5610–16, 5626, 5628–35. 3M does not dispute that the Three-Legged Stool campaign existed. Opp'n Memo 1–3, ECF No. 152. In reviewing the evidence, however, the Court concludes that Moldex has still failed to show by clear and convincing evidence that 3M acted with deliberate disregard for the rights and safety of others. The campaign was a business plan which consisted of: (1) selling 3M products through an AbilityOne agency like New Dynamics, (2) litigation if there was IP wrapped around any product, and (3) improvement of 3M's product. While subsequent communications discuss enforcing the IP against Moldex's product, there is no showing that 3M had knowledge that Moldex's product could not have infringed on its patent but nevertheless instituted litigation. Regardless of the effectiveness of 3M's business strategy, Moldex has put forward absolutely no evidence of 3M's knowledge that Moldex's product was not infringing its product. Without evidence of such knowledge on the part of 3M, Moldex has not met its burden to show deliberate disregard. Minn. Stat. § 549.20, subdiv. 1(b). Accordingly, Moldex's request to add a claim for punitive damages is denied.

**B.      Removing Earmuffs from Relevant Product Market**

The parties do not dispute that earmuffs are not a part of the relevant product market. Therefore, Moldex may remove earmuffs from the relevant product market in its Complaint. However, the Court concludes that the information related to earmuff product development must still be turned over in compliance with its previous order. *See* ECF No. 124. An action may be dismissed pursuant to Federal Rules of Civil Procedure 41(b) if a plaintiff fails to comply with any order of

the court. *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir.1984). The Court's October 28, 2015 Order (ECF No. 124) remains in effect.

## C.     Further Bases for Moldex's Unfair Competition Claim

In its Complaint, Moldex asserts unfair competition claims against 3M under California's Unfair Competition Law ("the UCL"). Cal. Bus. and Prof. Code § 17200; Compl. 16, ECF No. 1. The UCL is a broad remedial statute that permits an individual to challenge wrongful business conduct "in whatever context such activity might occur." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.*, 83 Cal. Rptr. 2d 548, 561 (1999). It prohibits "unfair competition," which it defines as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof.Code § 17200. Because the statute is written in the disjunctive, it is violated where a defendant's act or practice is (1) unlawful, (2) unfair, (3) fraudulent, or (4) uses false or misleading advertisements. *Cel-Tech*, 83 Cal. Rptr. 2d at 565. Each prong of the UCL is a separate and distinct theory of liability and offers an independent basis for relief. *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999).

Here, Moldex seeks to include allegations that 3M knowingly manipulated and used improper testing procedures to obtain a noise reduction rating ("NRR") that is misleading, in violation of EPA regulations and the Noise Control Act. Mem. in Supp. of Mot. 2, ECF No. 143; *see also* 40 C.F.R. § 211.201 *et seq*; 42 U.S.C. § 4901 *et seq.* 3M concedes that Moldex received The Flange Report, which outlined the testing procedures at the base of Moldex's claim, only three months ago and that Moldex was not able to take relevant depositions on The Flange Report until October. *See* Opp'n Mem. 31–34, ECF No. 152. Accordingly, the Court concludes that there is good cause to amend the scheduling order to allow Moldex to amend its Complaint. Furthermore, the Court concludes that there was no undue delay in bringing this motion, as Moldex filed its motion

within a month of conducting its depositions on The Flange Report. There has also been no showing of bad faith on Moldex's part.

3M asserts that the amendment would be futile under the UCL because (1) under the fraudulent prong, Plaintiffs have not alleged any facts that either it, any customer, or the military relied in anyway on the 22 NRR; (2) under the unlawful prong, the commissioned test from an independent lab established an NRR of 23, which disproves the very allegations Moldex is trying to add; and (3) under the unfair prong, it is derivative of Moldex's unlawful and fraudulent claims. ECF No. 152. Assuming without deciding that 3M's assertions under the UCL fraudulent and unfair prongs are correct, Moldex has still made assertions that 3M knowingly manipulated its testing in violation of at least the relevant EPA regulations and the Noise Control Act. As the UCL is written in the disjunctive, each prong of the UCL is a separate and distinct theory of liability and offers an independent basis for relief. Moldex must only make a showing under one of the UCL prongs to assert a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (A pleading must contain enough facts to state a claim for relief that is "plausible on its face," and a claim has facial plausibility only when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.) It is not apparent to this Court that simply because recent test data of the relevant product show an NRR of 23, that Moldex's claim of unlawful testing is futile. 3M's testing could have been unlawful regardless of the independent test. The Court, therefore, concludes that Moldex's allegations are not futile. *South Bay Chevrolet*, 72 Cal. App. 4th 861; *Sanders*, 823 F.2d at 216.

Finally, 3M argues that it will be prejudiced by this amendment because it cannot pursue the discovery it needs to defend itself given that the discovery period has closed. However, any prejudice 3M may face may be cured by allowing 3M to conduct limited discovery into Moldex's additional

bases for its UCL claim. Indeed, Moldex represented at the hearing that it would not oppose 3M's continued, focused discovery into the matter. Therefore, the Court will allow 3M to continue its discovery for 90 days from the date of this Order in order to build its defense to Moldex's allegations that it knowingly manipulated its testing procedures, through its predecessor Aearo. Accordingly, Moldex's request to amend its Complaint to allege further bases under the UCL is granted.

## IV. ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion to amend its complaint (ECF No. 141) is **GRANTED in part and DENIED in part** as follows:

1. To the extent the motion seeks to add a claim for punitive damages, the motion is **DENIED**.

2. To the extent Moldex seeks to remove earmuffs as the relevant product market from paragraph 12 of its Complaint, the motion is **GRANTED**. However, Moldex must still comply with all prior discovery orders, including the Court's October 28, 2015 Order (ECF No. 124).

3. To the extent Moldex seeks to allege further bases for Moldex's unfair competition claim against 3M, the motion is **GRANTED**. 3M has leave to conduct limited discovery as is necessary to defend itself against the additional claims for 90 days, commencing from the date of this Order.

DATED: December 23, 2015                                 *s/Franklin L. Noel*
                                                        FRANKLIN L. NOEL
                                                        United States Magistrate Judge